

# Missouri Court of Appeals

## Southern District

### Division Two

JOHN WALTER PHILLIPS, )
)
    Plaintiff-Appellant/Respondent, )
)
v. ) Nos. SD33173 and SD33259
) (consolidated)
MISSOURI TLC, LLC, DOYLE FROST, )
and DENNIS FROST, ) **Filed: June 30, 2015**
)
    Defendants-Respondents/ )
    Cross-Appellants, )
)
and )
)
DOYLE FROST, as personal )
representative of the Estate of BRENDA )
SUE FROST, )
)
    Defendants-Respondents, )
)
and )
)
SANDY FROST, )
)
    Respondent. )

### APPEAL FROM THE CIRCUIT COURT OF SHANNON COUNTY

Honorable David P. Evans, Circuit Judge

### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS

This consolidated appeal requires us to interpret the terms of a loan agreement

between Plaintiff John Walter Phillips ("Lender") and Defendant Missouri TLC, LLC

1

("Borrower").  Defendants Doyle and Dennis Frost are members of Borrower.  At the time of the loan, Dennis was married to Defendant Sandy Frost, and Doyle was married to Defendant Brenda Frost.[1]  The parties' dispute was tried to the court without a jury, and both sides now appeal the resulting judgment.

Lender alleges the trial court erred in finding that:  (1) Brenda and Sandy did not personally guarantee the loan; (2) a 5% premium on the sale of collateral was to be applied toward the balance of the loan; and (3) Lender was only entitled to one $5,000 late fee.  Borrower, Doyle, and Dennis appeal the portion of the judgment that holds Doyle and Dennis personally liable on the loan.

Finding merit in two of Lender's points, we affirm in part, reverse in part, and remand the matter with instructions.

### Standard of Review

We will affirm the judgment in a court-tried case unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law.  *Williams Constr., Inc. v. Wehr Constr., L.L.C.*, 403 S.W.3d 660, 662 (Mo. App. S.D. 2012) (quotation omitted).  We leave all credibility determinations to the trial court, "which is free to believe none, part or all of the testimony of any witness." *Id*.  In contrast to that deference, the "[i]nterpretation of a contract is a question of law and is subject to *de novo* review.  When interpreting a contract, the overriding concern of the appellate court is

---

[1] Brenda Frost is now deceased, and this court granted Lender's motion to substitute "Doyle L. Frost," as the personal representative of the estate of Brenda Sue Frost, for Brenda Frost.  On April 28, 2015, Doyle filed additional suggestions stating that an "order of No Further Process" had been entered in the probate matter "finding that [Brenda] had no property subject to administration" and that Doyle "is not currently serving as the Personal Representative[.]"  Due to the family relationships involved in this case, we use first names solely to avoid confusion.  And for simplicity's sake, we will refer to various Defendants, collectively, as "Respondents."

to give effect to the intentions of the parties." ***Crestwood Shops, L.L.C. v. Hilkene***, 197 S.W.3d 641, 648 (Mo. App. W.D. 2006) (internal citation omitted).

## Facts

Using one attorney to draft the documents, Borrower and Lender entered into a "LOAN AGREEMENT" in December 2010 in which Lender loaned Borrower $5,943,000 in exchange for a promissory note. Borrower used the loan proceeds to purchase real estate known as Jack's Fork Ranch or Monarch Place, from which Borrower intended to harvest timber. The loan was secured by a deed of trust on the real property. The loan agreement, along with its attached promissory note ("note") and deed of trust, formed one integrated, 11-page agreement ("the contract") that was marked and received into evidence at trial. Each component part of the contract was executed on the same day.

Paragraph 2 of the loan agreement is titled "**Loan.**" Sub-paragraph B of that paragraph states:

> In addition to the monthly payments provided in the [n]ote, Borrower shall pay the sum of five (5%) percent premium of all of the net proceeds from any sale of the collateral. Premium on any unsold amount of land will become due five (5) years from date at a rate of $1,280.00 per timbered acre or $640.00 per cleared acre.

Paragraph 3 of the loan agreement is entitled "**Timber Sales.**" Sub-paragraphs A and B of that paragraph state:

> A. Borrow [sic] further agrees to pay unto Lender five (5%) of any timber sales from the secured property.
>
> B. . . . . [Following a schedule of payments for harvested timber:] All payments for the sale of logs or timber products shall be payable monthly and applied directly to principal of loan. The payments for timber sales will be applied to principal only and will not reduce the monthly payments under the terms of the [note].

The loan agreement also reflected Lender's release of two previous promissory notes and incorporated the principal amounts from those notes ($200,000) into the current promissory note. At the bottom of the loan agreement, Doyle and Dennis signed as members of Borrower. In addition, Doyle, Dennis, Brenda, and Sandy all signed under the words "Personal Guaranty and Acceptance of Terms[.]" The note and deed of trust were signed only by Doyle and Dennis as members of Borrower.

Paragraph 4 of the note states:

> ***In case of default in payment of any installment of principal and interest for more than thirty (30) days from due date, there will be a $5,000.00 late fee.***

The note also provides that in the event of default, payment of the outstanding principal due (including accrued interest up to the time of collection) is accelerated and Borrower must pay for the attorney fees Lender incurs in collecting the debt. Under the category "<u>Miscellaneous,</u>" paragraph 5.E. of the loan agreement further provides that Borrower "will reimburse Lender for all of its expenses, including reasonable fees and expenses of legal counsel for Lender, incurred by Lender in connection with the . . . enforcement of this [contract] and the collection or attempted collection of the [n]ote, whether or not litigation is commenced."

Borrower fell behind on the loan after making twelve monthly payments on the note, plus two separate payments tendered after Borrower had sold a portion of the land. "[A]t some point," Lender declared a breach and accelerated the note. Lender's petition, filed in September 2012, included one count asserting a "Suit on Note" and a second count for "Breach of Contract."

4

Of the numerous times that Borrower harvested timber from the land, Borrower made only one "principal payment" (as denoted and required by paragraph 3.A. set forth above) from the proceeds of those sales, and Lender applied that payment to the loan balance. When Borrower sold a portion of the land, Lender applied only 95% of the proceeds of the sale to the principal balance of the loan.

At the conclusion of the evidence, the trial court observed that it was undisputed that Borrower had breached and defaulted on the contract, and the only issue the court needed to take under advisement was the issue of damages. In a subsequent "**DOCKET ORDER**," the trial court found that Lender "testified that he had received 1 payment from [Borrower] arising out of time [sic] sales" referred to in paragraph 3 of the loan agreement and that this payment was to "be applied to 'principal only' as the [loan agreement] provides in calculating [Lender's] damages[.]" The trial court summarily concluded that the evidence failed to establish that "the 5% premium referenced in paragraph 2.B was not to be applied to principal and interest" and that Lender was not "entitled (in case of default) to more than 'a $5,000 late fee.'" The trial court permitted the parties one week to file suggestions "regarding 'personal guarantee'" and any suggested recalculation of damages based on the findings contained in the trial court's docket order.

Following the filing of the parties' suggestions, and Lender's recalculation of the total damages with interest at $2,051,788.92 (plus attorney fees of $13,614.71), the trial court entered judgment in favor of Lender against Borrower, Doyle, and Dennis in those amounts plus an extra penny. The judgment also incorporated the docket order. The trial court concluded that Doyle and Dennis "agreed and intended to" personally guarantee the loan because of their experience as business owners, their status as officers of Borrower, and the

5

fact that they signed both as officers of Borrower and as individuals. In contrast, the trial court concluded that the same words "'personal guaranty and acceptance of terms'" were insufficient to show that Brenda and Sandy ("the spouses") intended to personally guarantee the loan because they were not a part of Borrower or its activities, they had no "other business connections with [Lender]" apart from signing the loan agreement, and no parol evidence was offered to explain the intent behind their signatures.

## Analysis

Lender claims the trial court erred in five respects. Lender's first point claims the trial court erred in finding Brenda and Sandy "not personally liable for the debt[.]" Lender's second, third, and fourth points contend the trial court erred for various reasons in finding that the five-percent premium referenced in paragraph 2.B. "was to be applied to the principal and interest on the loan[.]" Lender's final point alleges the trial court erred in finding that Lender was only entitled to one $5,000 late fee.[2]

Respondents' sole point claims the trial court erred in finding Doyle and Dennis personally liable on the note because neither had signed the note in their personal capacity, and no personal guaranty contract existed because "the words 'personal guarantee and acceptance of terms' do not form a contract."

### *The Personal Guarantees*

We combine for analysis Lender's first point and Respondents' sole point, which both address the "personal guaranty" language in the contract. Lender asserts the trial court erred by misstating or misapplying the law in finding that the spouses were not personally liable in that the words "'personal guaranty' are sufficiently definite to create personal liability for the

---

[2] Respondents' brief only addresses Lender's first point. We must therefore adjudicate Lender's other error claims without the benefit of whatever argument Respondents might have provided. *Jordan v. City of Centerville*, 119 S.W.3d 214, 217 n.4 (Mo. App. S.D. 2003).

6

debt[.]" And Lender contends that because the trial court found Doyle and Dennis personally liable based upon the very same language, there was no basis for the trial court to conclude that the spouses were not also personally liable.

Although Lender rightly notes the inconsistency in the trial court's rulings on the personal guaranty issue, the argument would work just as well in the other direction. In other words, the argument that all four should have been treated the same does not support a claim that the ruling as to Doyle and Dennis was the correct one. The trial court's rationale for treating the spouses differently was based upon the difference in their level of participation in Borrower. According to the trial court, because the spouses did not participate in Borrower, it could not determine the measure of Lender's damages against the spouses. The problem with the trial court's rationale is that it relies on a factual distinction that has no legal relevance.

The spouses did not have to have participated in the affairs of Borrower in order to be held personally liable on the loan. *Mercantile Trust Co. v. Carp*, 648 S.W.2d 920, 924 (Mo. App. E.D. 1983) ("A guarantor's liability for a corporation's debt is not dependent upon the guarantor's interest in the corporation"). Respondents do not argue that their signatures were procured by fraud or deceit, and it would be unreasonable to assume that the spouses signed the document for no reason. The plain language of the contract and the placement of their signatures beneath the clause indicate that all of those signing intended their signatures to signify their acceptance of the words "personal guaranty and acceptance of terms." That leads us to the question of the legal import of that language.

Although use of the word "guarantee" may create even original liability when the parties so intend, *Bridge v. Welda State Bank*, 292 S.W. 1079, 1083 (Mo. App. K.C.D.

7

1927), Lender does not argue that the spouses were originally liable on the loan. We must therefore determine whether the spouses indicated an intent to become secondarily liable. "A guarantor agrees to become secondarily liable for the obligation of a debtor in the event the debtor does not perform the primary obligation." *Jamieson-Chippewa Inv. Co. v. McClintock*, 996 S.W.2d 84, 87 (Mo. App. E.D. 1999).

Respondents argue that the spouses cannot be personally liable because the words "'personal guarant[y] and acceptance of terms'" are insufficient to form a contract in the absence of a recitation of the consideration supporting the personal guaranty.[3] Respondents have failed to direct us to any authority supporting that proposition. It is true that a guaranty is a separate contract that must be supported by consideration, *Henty Constr.*, 783 S.W.2d 412, 418 (Mo. App. E.D. 1989), but this does not mean that a guaranty must recite again consideration that is evident elsewhere in a loan agreement.[4] "A guaranty executed contemporaneously with the execution of a promissory note may be considered a part of the original note transaction and supported by the same consideration." *Id*. at 419. In other

---

[3] Respondents suggest that a personal guaranty should resemble the one set out in *Capitol Grp., v. Collier*, 365 S.W.3d 644, 650-51 (Mo. App. E.D. 2012) (quoting and emphasizing a guaranty from *Warren Supply Co. v. Lyle's Plumbing, L.L.C.*, 74 S.W.3d 816, 818 (Mo. App. W.D. 2002) stating "I *personally guarantee* to you ... and *I hereby agree to bind myself to* pay you on demand any sum which may become due to you *by my firm* whenever the firm shall fail to pay the same"). While we have no quarrel with the propriety of the cited language, a writing need not be contained in a single document, *Rone v. Reeves*, 20 S.W.3d 526, 529 (Mo. App. S.D. 2000), and the trial court may rely upon terms from the loan transaction as a whole to determine the parties' intent. Additionally, although *Capitol Grp.* may provide one example of how a personal guaranty may be structured, it is not the only approved way. In *Jamieson-Chippewa*, there were no words of guaranty in a lease agreement other than the single word "Guarantors," on the signature page of the lease. 996 S.W.2d at 86. And although the guarantors' liability was strictly construed, that one word was sufficient to create the guaranty. *Id*. at 89.

[4] "Benefit to the debtor *or* detriment to the creditor constitutes sufficient consideration to support a guaranty since a guarantor need not receive any benefit from either the principal contract or the guaranty." *Id*. at 418 (emphasis added). While either form of consideration is sufficient, here Borrower not only benefited by the extension of the loan, but Lender suffered the detriment of releasing two previous promissory notes. There was sufficient consideration to support the guaranty.

words, the concern is whether the contemporaneous transaction as a whole indicates the existence of the necessary consideration for the guaranty.[5]

Respondents' arguments against personal liability for Doyle and Dennis are identical to their faulty arguments against liability for Brenda and Sandy. Because the contract clearly and unambiguously indicates that each of the individual defendants intended to be secondarily liable for the loan, Lender's first point is granted, and Respondents' sole point is denied.

*The 5% "Premium"*

Lender's second point contends the trial court misapplied or misstated the law in finding that "the five percent premium provided for in paragraph 2.B. of the [l]oan [a]greement was to be applied to the principal and interest on the [note]" instead of as "a payment in excess of the principal, particularly where the parties expressly provided in the subsequent paragraph that payments from timber sales 'will be applied to principal[.]'"[6]

> In considering the contract's language, we understand it according to the plain and ordinary meaning of the words used, or the meaning that a person of average intelligence, knowledge, and experience would deem reasonable. *Farmland Industries, Inc. v. Republic Insurance Company*, 941 S.W.2d 505, 508 (Mo. banc 1997). The dictionary is a good source for finding the plain and ordinary meaning of contract language. *Shahan v. Shahan*, 988 S.W.2d 529, 535 (Mo. banc 1999). But we must be careful to consider the contract's context in applying the appropriate dictionary definition. *Wilshire Construction Company v. Union Electric Company*, 463 S.W.2d 903, 906 (Mo.1971).

***Bailey v. Federated Mut. Ins. Co.***, 152 S.W.3d 355, 357 (Mo. App. W.D. 2004).

---

[5] The same rule would not apply if the guaranty contract had occurred *after* the loan transaction was completed. ***Springfield Television, Inc. v. Gary***, 628 S.W.2d 398, 403 (Mo. App. S.D. 1982) ("[i]f the contract of guaranty occurs subsequent to the original, it must have a new and independent consideration, not merely the performance embraced in the original").

[6] Lender's argument in support of Point II asserts that the trial court "erroneously declared or misapplied the law, in that the trial court considered parol testimony to vary or contradict the terms [of] Paragraph 2.B[.]" That error claim is not included in the point relied on, so we do not consider it. *See **Roberts v. Progressive Nw. Ins. Co.***, 151 S.W.3d 891, 894-95 (Mo. App. S.D. 2004) (an error not included in the point relied on is not preserved for review).

Lender argues that the parties' use of the term "'premium'" and the clause "[i]n addition to the monthly payments provided in the [n]ote" signals their intent to designate the funds at issue as being owed in addition to the principal and interest on the note.  Lender further relies on definitions of the word "'premium'" in two online dictionaries accessed in June 2014[7] and Black's Law Dictionary.  The latter defines premium, apart from the contexts of insurance and securities, as "[a] sum of money paid in addition to a regular price, salary, or other amount; a bonus."  ***Black's Law Dictionary*** 1300-01 (9th ed. 2009).  Another dictionary in print at the time of the contract defines the noun "premium" as

> **1a:**  a reward or recompense for a particular act  **b:**  a sum over and above a regular price paid chiefly as an inducement or incentive  **c:**  a sum in advance of or in addition to the nominal value of something <bonds callable at a ~ of six percent>  **d:**  something given free or at a reduced price with the purchase of a product or service  **2:**  the consideration paid for a contract of insurance  **3:**  a high value or a value in excess of that normally or usu. expected <put a ~ on accuracy>

***Merriam-Webster's Collegiate Dictionary*** 980 (11th ed. 2005).  Thus, "premium" is subject to multiple definitions, but in the ordinary context, the common thread running through them is that a premium is something extra.  Considering such a definition in the context of the whole contract indicates that the premium was intended to be an extra obligation that would not be applied to the balance of the note.

However, Lender's more specific argument is a better one.  Lender points out that because paragraph 3.B. of the loan agreement specifically provides that sale of timber proceeds are to be applied "[a]s an additional payment on the principal of the loan to Lender" and that "[a]ll payments for the sale of logs or timber products shall be payable monthly and applied directly to principal of loan[,]" the absence of such language in

---

[7] *See* http://www.merriam-webster.com/dictionary/premium and http://www.thefreedictionary.com/premium.

paragraph 2.B. suggests that the opposite result was intended there -- that the five-percent premium on "all of the net proceeds from any sale of the collateral" would *not* be applied to principal. Words are known by the company they keep. ***Edward Lowe Indus., Inc. v. Mo. Div. of Emp't Sec.***, 865 S.W.2d 855, 863 (Mo. App. S.D. 1993). Because the word "premium" appears only in paragraph 2.B. and does not direct that the proceeds be applied to principal, we are persuaded by Lender's argument that the parties used the term "premium" in paragraph 2.B. regarding sales of collateral to refer to an extra or additional obligation apart from Borrower's obligation to repay the note with monthly payments and specific proceeds from timber sales. If the parties had intended to treat these different types of proceeds similarly, they would presumably have used the same or similar language. Their failure to do so indicates the opposite intent. Point II is also granted.[8]

*The $5,000 Late Fee(s)*

Lender's fifth point asserts the trial court erred in finding that he was "only entitled to one $5,000 late fee because the trial court misstated or misapplied the law in that the" contractual language clearly and unambiguously provided for a late fee for every missed installment payment. The note calls for a "5,000.00 late fee" in the event "***of default in payment of <u>any</u> installment of principal and interest for more than thirty (30) days from due date***[.]" (Emphasis added). Lender contends that use of the word "any" supports his argument that Borrower owed a late fee every time a payment was missed. It is true that "[t]he word 'any' is all comprehensive and is the equivalent of the words 'every' and 'all[.]'" ***Knowles v. Moore***, 622 S.W.2d 803, 806 (Mo. App. S.D. 1981); *see also* ***Merriam-***

---

[8] Lender's third and fourth points contend the trial court erred in finding that the five-percent premium was to be applied to the loan balance and not in addition to the monthly payments in that the trial court's judgment was not supported by substantial evidence or, alternatively, was against the weight of the evidence. We do not need to address these additional arguments as our resolution of Lender's second point renders them moot.

11

*Webster's Collegiate Dictionary* 56 (11th ed. 2005) (including, *inter alia*, definitions of "any" as "EVERY[,]" "ALL[,]" and "one or some indiscriminately of whatever kind").  But this is not the end of our determination of whether the trial court erred in denying the additional late fees sought by Lender.

In a claim for breach of contract, "[l]iquidated damages clauses are valid and enforceable; penalty clauses are not."  *Grand Bissell Towers, Inc. v. Joan Gagnon Enters., Inc.*, 657 S.W.2d 378, 379 (Mo. App. E.D. 1983).

> A penalty provision specifies a punishment for default, while liquidated damages are provided as a measure of compensation that, at the time of contracting, the parties agree will represent damages in the event of a breach. For a damage clause to be valid as setting liquidated damages, the amount fixed as damages must be a reasonable prediction for the harm caused by the breach and the harms must be of a kind difficult to estimate accurately.  In determining whether an agreement sets forth liquidated damages or a penalty, this Court looks to the intent of the parties as determined from the contract as a whole.

*City of Richmond Heights v. Waite*, 280 S.W.3d 770, 776 (Mo. App. E.D. 2009) (citations omitted).  While it is not necessary to actually prove damages in the same amount as stated in a liquidated damages provision,[9] we have reasoned that "without evidence of damages, a liquidated damages clause actually becomes a penalty and is unenforceable."  *Strouse v. Starbuck*, 987 S.W.2d 827, 829 (Mo. App. S.D. 1999).

Here, Lender presented no evidence suggesting that he suffered any damage from Borrower's default that would not be covered by his other contractual claims for outstanding principal, premiums, accumulated interest, and attorney fees.[10]  Given the availability of

---

[9] "'[T]he more difficult it is to forecast the amount of damages, the less proof there need be to show that the liquidated amount is a reasonable estimate of actual damages.'"  *Star Dev. Corp. v. Urgent Care Assocs.*, 429 S.W.3d 487, 493 (Mo. App. W.D. 2014), (quoting Harry F. Luepke III, *How to Draft and Enforce a Liquidated Damages Clause*, 61 J. MO. B. 324, 325 (2005)).

[10] Lender agreed that he calculated "*penalties* for the failure to make monthly payments on time as called for by page 7 of the note" and he indicated that these penalties totaled $90,000.  (Emphasis added.)  While we do

12

these other means of recovering his damages, nothing in the evidence before the trial judge suggests that $5,000 -- much less $90,000 -- was a "reasonable prediction for the harm caused by the breach" or that there was some other "harm" that was "of a kind difficult to estimate accurately." ***Richmond Heights***, 280 S.W.3d at 776.  Point V is denied.[11]

### Decision

Insofar as it finds Doyle and Dennis personally liable on the loan and awards the unchallenged $5,000 "late fee," the judgment is affirmed.  The judgment is otherwise reversed, and the matter is remanded to the trial court for the entry of a judgment consistent with this opinion.

Lender also filed a motion with this court for an award of attorney's fees on appeal based upon the terms of the contract.  "Attorney fees may be awarded on appeal if they are based on a written agreement that is the subject of the issues presented in the appeal." ***Am. Nat'l Ins. Co. v. Noble Commc'ns Co.***, 936 S.W.2d 124, 134 (Mo. App. S.D. 1996).  Such an agreement exists here.  Lender's motion is granted, and the trial court is also directed to assess and include an award of such fees in its judgment.


DON E. BURRELL, J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. - CONCURS

GARY W. LYNCH, J. - CONCURS

---

not consider parol evidence, including Lender's testimony, as to the meaning of the late fee, it appears that Lender would have difficulty arguing that this clause was not a penalty given his characterization of it at trial.
[11] Although the trial court apparently included one $5,000 late fee to Lender in its calculation of Lender's damages, Respondents have not appealed that award.  *See **Pollock v. Berlin-Wheeler, Inc.***, 112 S.W.3d 73, 79 (Mo. App. W.D. 2003) (respondent "was entitled to the entire amount of the check" but its "failure to cross appeal . . . prevents this court from awarding [respondent] the entire amount").