

# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| KANSAS CITY LIVE BLOCK 139 RETAIL, LLC, | ) ) ) | WD78786 and WD78912 |
| Respondent, | ) ) | OPINION FILED: |
| v. | ) ) | |
| FRAN'S K.C. LTD, ET AL., | ) ) | August 9, 2016 |
| Appellants. | ) ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable Robert Michael Schieber, Judge**

**Before Division One:**
**Anthony Rex Gabbert, P.J., Thomas H. Newton, and Alok Ahuja, JJ.**

Fran's K.C. Ltd., Mr. Hak Joon Kim, and 1482111 Ontario Inc. (Collectively Fran's) appeals a judgment denying their request for a jury trial, awarding liquidated damages, awarding late charges, and awarding attorney fees. Fran's entered into a lease agreement with Kansas City Live Block 139 Retail, LLC (KC Live) for premises in the Kansas City Power & Light District. The lease contained provisions addressing the payment of rent, liquidated damages, late charges for past due rent, and the payment of attorney fees in case of litigation. Mr. Kim and 1482111 Ontario Inc. are guarantors on the lease. The issues on appeal include claims of trial court error in denying Fran's request for a jury trial, awarding liquidated damages and late

charges to KC Live, and awarding attorney fees to KC Live. We affirm in part and reverse in part.

## Factual and Procedural Background

Appellant, Mr. Kim, owns and operates a few Fran's Restaurants in Canada. Respondent, KC Live, is a Cordish Co. entity that functions as a landlord for tenants within the Kansas City Power & Light District. After meetings between representatives for Fran's and KC Live, KC Live provided a letter of intent with potential lease terms to Fran's. This letter included a three-year corporate guaranty and a rolling guaranty of one year's base rent for the fourth and fifth year. Mr. Kim had indicated that he would not sign a personal guaranty.

In February 2009, Fran's, as a tenant, and KC Live, as a landlord, executed a ten-year lease for the premises. At this time, Mr. Kim also signed a guaranty unconditionally guaranteeing the prompt and full payment of all rent and performance of all obligations under the lease by Fran's. By a notice of possession, KC live notified Fran's that the 120-calendar day fixturing period began on February 26, 2009. Under section 321 of the lease, the rent commencement date was June 27, 2009, the day after the start of the fixturing period. Fran's opened on October 15, 2009. On May 5, 2010, the parties signed a lease amendment negotiated in response to a dispute between the parties with respect to: (a) the rent commencement date; (b) the date Fran's actually opened; (c) whether Fran's was required to pay liquidated damages under the terms of the lease for the period of time between the rent commencement date and the date Fran's actually opened; and (d) whether KC Live

2

was required to pay Fran's the full lease incentive payment in light of Fran's failure to open on time.

Under section 201(d), Fran's agreed to pay minimum rent for the first year of the term in the amount of $217,920 annually and $18,160 monthly. For each following lease year the minimum rent increased by the greater of (i) the increase in the Consumer Price Index or (ii) two and one-half percent (2.5%) cumulatively. Under section 301, Fran's also agreed to pay additional rent which includes a common area maintenance charge, taxes, promotional charges and extra charges/uncontrollable common area maintenance. In section 2605, the lease addresses the protocol for recovery and compensation of late rent. In addition, section 2602(vii) addresses the procedure if Fran's failed to conduct business on the premises for more than three (3) consecutive business days. The lease also requires that, if KC Live filed suit against Fran's for any reason, Fran's would pay KC Live its reasonable attorney fees and costs for litigation, which are stipulated, "if suit is for past due Rent and/or money damages," to be not less than fifteen percent (15%) of the monies awarded to KC Live.

KC Live sent Fran's notices of default on April 1, May 25, July 24, October 18, November 17, and December 15, 2011, and January 11, and February 22, 2012. As of March 10, 2015, all appropriate credits were awarded to Fran's, leaving Frans's with an outstanding balance of $3,596,557.89 owed to KC Live under the Lease. After a September 2012 bench trial, KC Live was awarded possession of the premises. To re-let the premises in first-class rentable condition, KC Live had to give the subsequent tenant a $400,000 tenant finish allowance and permission to use the

3

trade fixtures left on the premises by Fran's. In September 2013, KC Live filed its first amended petition, which included causes of action for breach of the lease and breach of the guaranty. Fran's, answer and counterclaim to KC Live's petition included causes of action for fraud in the inducement, negligent misrepresentation, breach of the lease, and conversion. Following a March 2015 bench trial, the trial court entered judgment against Fran's, jointly and severally, in the amount of $3,596,577.89. The trial court also determined that KC Live was entitled to attorney fees and costs under the terms of the parties' lease and awarded KC Live attorney fees and costs in the amount of $863,706.70. This appeal follows.

**Legal Analysis**

In the first point, Fran's argues that the trial court erred in denying its request for a jury trial because the jury trial waivers in the lease and guaranty do not apply to the tort claims asserted in its counterclaims.

"The interpretation of a lease agreement is a question of law, to which the general rules of contract construction apply." *Langdon v. United Restaurants, Inc.*, 105 S.W.3d 882, 887 (Mo. App. W.D. 2003). "We review the language of a lease *de novo*" to give effect to the parties intentions. *Stratman v. Wagner*, 427 S.W.3d 915, 919 (Mo. App. S.D. 2014); "The intent of the parties is to be based upon the terms of the contract alone and not on extrinsic evidence unless the contract language is ambiguous." *Langdon*, 105 S.W.3d at 887.

The right of a jury trial is a constitutionally guaranteed personal right that may be waived. *Malan Realty Inv'rs, Inc. v. Harris*, 953 S.W.2d 624, 625-26 (Mo. banc 1997).

4

Section 37 of the lease states:

> To induce landlord and tenant to enter into this lease, landlord and tenant each hereby waive any right to a trial by jury of any or all issues arising in any action or proceeding between landlord and tenant or their successors, assigns, personal or legal representatives and heirs under or in connection with this lease or any of its provisions. This waiver is knowingly, intentionally and voluntarily made by landlord and tenant, and landlord and tenant each acknowledge that neither landlord nor tenant nor any person acting on behalf of landlord or tenant has made any representations of fact to induce this waiver of trial by jury or in any way to modify or nullify its effect. Landlord and Tenant each further acknowledge that he, she or it has had the opportunity to discuss this lease with legal counsel.

Fran's argues that its first two counter claims asserting fraud in the inducement and negligent misrepresentation do not arise under the lease. Fran's relies on a series of arbitration cases for support. Specifically, Fran's relies on *Missouri & Northern Arkansas Railroad Co., Inc. v. Branson Scenic Railway, Inc.,* 3 S.W.3d 869, 871 (Mo. App. S.D. 1999), stating that for a claim to be related to a contract "it must, at the very least, raise some issue the resolution of which requires a reference to our construction of some portion of the…[c]ontract." The court, however, also explained that, to determine if the claim was "in connection with" the language of the arbitration agreement, the analysis "requires an examination of the connection between the …claims and the …[a]greement to determine if the claims raise some issue that requires a reference to or construction of some portion of the [a]greement." *Id*. The court concluded that no connection existed between the claims and the agreement because "[n]one of the pleadings make any reference to the Operating Agreement." *Id*. Here, Fran's provides numerous facts that relate directly to the lease in a section titled "Facts Applicable to All Counts." The facts from this section are also expressly incorporated into the Fraud in the inducement and negligent

5

misrepresentation counts. In addition, paragraphs 28-29 and 52-53 of Fran's counterclaim allege that one of KC Live's misrepresentations was a personal assurance by Blake Cordish that Mr. Kim's personal guarantee would not be required as a lease condition. The only way the truth or falsity of Cordish's assurance could be determined would be by reviewing the terms of the lease and associated documents.

Fran's counterclaims also contain detailed allegations that KC Live engaged in a "predatory leasing scheme" that involved enticing a new tenant to agree to exorbitant rent and other oppressive lease terms, making misrepresentations to the prospective new tenant concerning potential revenues, ousting the new tenant after the inevitable failure of its operation, and then renting the space (including the prior tenant's build-out and installed fixtures) to a new entity, which was often a Cordish affiliate. Fran's answer expressly alleged, in both its fraudulent inducement and negligent misrepresentation counterclaims, that the misrepresentations at issue were part of this "predatory leasing scheme." Fran's contention that KC Live engaged in a "predatory leasing scheme" necessarily required review of the terms of the lease, and Fran's offered expert testimony at trial to substantiate its claim that the lease terms were unreasonable and oppressive.

The circuit court's resolution of the fraud and negligent misrepresentation counterclaims required reference to the terms of the lease in an additional respect. In its judgment, the circuit court found that Fran's had no right to rely on any alleged pre-contractual misrepresentations by KC Live, because the lease contained provisions attesting that KC Live had made no representations, and that Fran's had

"satisfied itself of all its concerns, if any, by conducting an independent investigation into all prior information provided by (or statements made by) Landlord or its agents."

Therefore, Fran's fraudulent inducement and negligent misrepresentation claims necessarily required reference to, and construction of, the terms of the lease. It is clear that the claims of fraud and negligent misrepresentation are intertwined with the lease, thus classifying them as "in connection with" as explained in *Missouri & Northern Arkansas Railroad Co., Inc.*, 3 S.W.3d at 871. We conclude, therefore, that Fran's waived its right to a jury trial by accepting the trial waiver provision within the lease. Point one is denied.

In the second point, Fran's argues that the trial court's liquidated damages award to KC Live was erroneous because KC Live failed to prove any actual damages and treble rent was not a reasonable estimate of potential damages. Therefore, Fran's argues that the liquidated damages for the time the premises were dark constitutes an impermissible penalty.

Liquidated damages clauses are valid and enforceable while penalty clauses are not. *City of Richmond Heights v. Waite*, 280 S.W.3d 770, 776 (Mo. App. E.D. 2009). "A penalty provision specifies a punishment for default, while liquidated damages are provided as a measure of compensation that, at the time of contracting, the parties agree will represent damages in the event of a breach." *Id*. "For a damage clause to be valid as setting liquidated damages, the amount fixed as damages must be a reasonable prediction for the harm caused by the breach and the harms must be of a kind difficult to estimate accurately." *Id.* "In determining whether an agreement

7

sets forth liquidated damages or a penalty, this Court looks to the intent of the parties as determined from the contract as a whole." *Id*. "The provision must be fixed on the basis of compensation, or else it is construed as a penalty clause primarily designed to compel performance." *Id*. *See Grand Bissell Towers, Inc. v. Joan Gagnon Enters., Inc.*, 657 S.W.2d 378, 379 (Mo. App. E.D. 1983) (discussing Missouri's adoption of the Restatement of Contracts rules for determining if liquidated damages are actually a penalty.)

The liquidated damages clause at issue states:

> If Tenant fails to conduct its business operations at the Premises during the Minimum Store hours for more than three (3) consecutive business days, it is agreed and understood that Landlord shall have been deprived of an important right under this Lease and, as a result thereof, shall suffer damages in an amount which is not readily ascertainable; therefore, in addition to, and not in lieu of, any other remedies which Landlord has under this Lease, at law or in equity, Landlord shall have the right to collect as liquidated damages (and not as a penalty) three (3) times the Rent due for each month, or portion thereof, that such discontinuance shall persist. Notwithstanding the foregoing in this Section 2602 (vii), Tenant shall not be deemed to have failed to be open for business if Tenant closes (a) for inventory (provided that such closing for inventory does not exceed 48 hours in any twelve (12) month period), (b) for Christmas Day, New Year's Day, Labor Day, Memorial Day or Independence Day, or (c) during the period in which the Premises are untenantable due to a fire or other casualty provided Tenant diligently pursues repairs and reopening.

In Missouri, a plaintiff must show the existence of actual harm or damages before a "liquidated damages clause can be triggered." *Grand Bissell Towers, Inc.*, 657 S.W.2d at 379. Thus, "'[i]f,…, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable.' The showing of harm or damage necessary to trigger the liquidated damages clause need not to be a precise dollar amount but simply a showing that some harm or damage did in fact

8

occur." *Id.* at n.3. (internal citations omitted). Although proof of actual damages is required to trigger a liquidated damages clause, "[l]iquidated and actual damages generally may not be awarded as compensation for the same injury." *Warstler v. Cibrian*, 859 S.W.2d 162, 165 (Mo. App. W.D. 1993). "Further, 'where parties especially provide or stipulate for liquidated damages, such liquidated damages take the place of any actual damages suffered and any recovery for breach is limited to the amount so agreed upon.'" *Id.* (quoting *Trans World Airlines, Inc. v. Travelers Indem. Co.*, 262 F.2d 321, 325[1] (8th Cir. 1959)).

Here, Fran's acknowledges that KC Live proved it was harmed because Fran's failed to pay the full amount of rent owed. Default of this nature, however, is governed by lease subsections 2602(i) and (ii). To prove the existence of actual damages so as to trigger the liquidated damages clause, KC Live needs to show that Fran's "fail[ed] to conduct its business operations at the Premises during the minimum store hours for more than three (3) consecutive business days." At trial, KC Live's representative, Mr. Robert Fowler, testified that the premises were dark in November 2012, after Fran's closed, until July 2013. He further testified that, although it is possible to calculate the difference in rent between what the new tenant is paying and what Fran's would have paid under the lease, "you don't have the ability to calculate how much of that loss, how much of the lower rent you got was caused by the fact that the store was dark." Therefore, the unquantifiable harm stemming from the vacancy was clearly shown and effectively triggers the liquidated damages clause. *See Paragon Group, Inc. v. Ampleman*, 878 S.W.2d 878, 881 (Mo. App. E.D. 1994) ("Missouri courts have consistently held actual damages for breach

9

of real estate sales contracts are uncertain and difficult to prove…[w]hile the amount of rent due under the lease is easily measurable, it is hard to say how long the apartment will be vacant or how much time, expense and energy will be expended to re-let the premises. It is also difficult to estimate whether or how many prospective long-term tenants were turned away while the leasing tenant occupied the premises or how this damaged the landlord.").

The validity of the liquidated damages clause hinges on the reasonableness of the requested damages. For a liquidated damages clause to be valid, the requested amount must be "so fixed [as] a reasonable forecast of just compensation for the harm that is caused by the breach." *Grand Bissell Towers, Inc.*, 657 S.W.2d at 379 (quoting *Restatement (Second) of Contracts*, § 339). Thus, the damages "must not be unreasonably disproportionate to the amount of harm anticipated when the contract was made." *Burst v. R.W. Beal & Co., Inc.*, 771 S.W.2d 87, 90 (Mo. App. E.D. 1989). Under Missouri law, liquidated damages upheld as reasonable provide compensation for a fraction of the total amount owed under the contract. *Luna v. Smith*, 861 S.W.2d 775, 779 n.3 (Mo. App. S.D. 1993) ("[T]he amounts of the inventory calculations [at issue in this case] are 3.61 percent and 3.55 percent, respectively, of the total monthly rental payments that the lease agreement would have produced had plaintiff not terminated it. The liquidated damages that were upheld in *Sides Construction Co. v. City of Scott City, supra,* were 3.029 percent of the total amount of the contract. In *Stein v. Bruce*, 366 S.W.2d 732, 737 (Mo. App. 1963), 10 percent of the purchase price was determined to be a reasonable provision for liquidated damages. *See also Highland Inns Corp. v. Am. Landmark Corp.,* 650 S.W.2d 667, 674 (Mo. App. W.D.

10

1983), which upheld an award of $10,000 based upon a liquidated damages provision where there was evidence of loss from $50,000 to $200,000 on a transaction in which the purchase price was $950,000."). When examining the March 10, 2015, Tenant Summary for Fran's, it is clear that the property was vacant from November 12, 2012, until July 9, 2013. During this period, rent, certain utilities, fees and taxes were charged at a rate of $33,521.25 for December 2012 and $32,576.48 monthly for January through June 2013.[1] For this time period, Fran's was charged liquidated damages of $60,104.11 for November 13, 2012, through November 30, 2012; $98,982.87 for December 2012; and $97,729.45 monthly for January 2013- July 2013. Therefore, instead of awarding a portion of the contract term as a compensatory amount, the contract calls for an award of 300% of the contract amount in addition to the rent already awarded. Further, due to the unpredictable nature of the damages suffered because of the vacancy of the premises, no testimony was provided to indicate that an award of 300% of the contract amount is in fact proportionate to the anticipated harm. Contrarily, KC Live's testimony explaining this provision indicates that the award is for three times the amount of rent *in addition to* the payment of base rent. Due to this award calculation, Fran's is responsible for paying the treble damages as well as the base rent owed because of the breach, meaning it is paying excess compensation for the actual harm suffered. Because of the inflation between the potential damages caused by harm and the amount requested under the contract, it is clear that this provision functions to compel performance via penalty instead of simply providing just compensation.

---

[1] For July 2013, the liquidated damages awarded were prorated to represent the dark period of July 1, 2013- July 9 2013.

11

Therefore, this provision is unenforceable under Missouri law. Thus, we grant point two and reduce the trial court's judgment to eliminate the award of damages under this provision.

As previously explained," [a] penalty provision specifies a punishment for default." *City of Richmond Heights*, 280 S.W.3d at 776. "The provision must be fixed on the basis of compensation, or else it is construed as a penalty clause primarily designed to compel performance." *Id.* Thus, an enforceable late-fee provision must be a "reasonable prediction for the harm caused by the breach." *Phillips v. Missouri TLC, LLC*, 468 S.W.3d 398, 407-08 (Mo. App. S.D. 2015).

As to the third point, Section 2605 states:

> If Tenant fails to pay any Rent in accordance with the provisions of this Lease when such Rent becomes due and payable as specified in Section 711, Tenant shall pay to Landlord a late charge equal to the greater of five percent (5%) of the amount due or Two Hundred Fifty Dollars ($250.00) for each month that such Rent remains unpaid, and, in addition, such unpaid Rent shall bear interest at the Lease Interest Rate. Such late charge and interest shall constitute Additional Rent hereunder immediately due and payable. If payments have been accelerated pursuant to Section 2602(iv) or Section 2602(v) above, all Additional Rent due under any provision of this Lease, including, but not limited to, all charges and interest, shall be due and payable immediately.

Fran's argues that the trial court's award of late charges to KC Live was erroneous because KC Live failed to prove any actual damages and the late charge is not a reasonable estimate of potential damages. Fran's asserts that KC Live failed to introduce evidence showing that it incurred any actual damages over and above the time value of money for which the ten percent (10%) interest compensated. In this case, the determination of the nature and scope of damages KC Live suffered is a question of fact to be determined by the trial court. In turn, its determination binds

12

the appellate court unless there is no substantial evidence to support it. *Norcomo Corp. v. Franchi Constr. Co., Inc.*, 587 S.W.2d 311, 317 (Mo. App. E.D. 1979). As stated in its judgment, the trial court determined that "KC Live sent Fran's Notices of Default on April 1, 2011, May 25, 2011, July 22, 2011, October 18, 2011, November 17, 2011, December 15, 2011, January 11, 2012, and February 22, 2012."[2] Relying on *Star Development Corp. v. Urgent Care Assocs., Inc.,* 429 S.W.3d 487, 492-93 (Mo. App. W.D. 2014) KC Live argues that, as to these notices, it was "forced to incur lost time and resources in conjunction with administrative tasks" which is sufficient to support the award of late charges. We disagree.

Although a fifteen percent (15%) late charge was upheld in *Star Development Corp.*, the lease provision at issue in that case differs from the provision here. In *Star Development Corp.*, this Court explained that, when analyzing a late-charge provision, for it to be deemed valid,

> "[t]he provision must be fixed on the basis of compensation, otherwise it is construed as a penalty clause designed primarily to compel performance. While the label the parties attach to a provision is not conclusive, it is a circumstance to be considered when deciding whether the provision is to be considered liquidated damages or a penalty."

429 S.W.3d at 492. (internal citations omitted). The contested provision expressly "indicated that the late charge was intended to compensate Star Development for the administrative expenses it would incur if Urgent Care failed to pay the rent on time." *Id.* Thus, the unambiguous lease language was a clear indicator of the parties' intent. *Id.* In addition, Star Development offered testimony outlining the extensive administrative efforts expended in relation to Urgent Care's past-due status. *Id.* at

---

[2] The judgment refrains from making factual findings on the damages incurred from the lost time and resources expended in executing these administrative tasks.

693. Consequently, this Court held that "[g]iven the difficulty of estimating [Star Development's] actual harm due to these unknown variables at the time the lease was made, the 15% late charge to which Urgent Care expressly agreed was a reasonable forecast of damages to compensate [Star Development] for its administrative efforts." *Id.* It is also significant that, in *Star Development Corp.*, the late fee was a one-time charge of 15% of the delinquent rental amount, whereas in this case the 5% late fee was calculated monthly and would be compounded by the assessment of an additional 5% late fee, calculated on the entire amount of the rental arrearage. The 15% late fee in *Star Development Corp.* ranged between $470 and $506 per delinquent payment, 429 S.W.3d at 493; in this case, due to the compounding feature, the late fee ballooned from less than $600 in the first month it was assessed (December 2011), to more than $46,000 per month in the final month (February 2015). The total late fee assessed by the circuit court was $1,069,779.40; this exceeded the unpaid rent of $937,203.44, and was more than five times the total interest assessed of $197,034.16. The late-fee provision of the present lease is wholly unlike the late fee upheld in *Star Development Corp.*

We also note that KC Live failed to show that it suffered any substantial damages from Fran's default not already compensated by other contractual provisions. In its brief, KC Live identifies only two administrative actions that it undertook in response to Fran's default: sending eight default letters (which KC Live notes were "typewritten and . . . sent to Defendants via certified mail"); and generating "e-mails attached to a number of the letters from KC Live to Defendants inquiring about the status of the late payments." KC Live asserts that the trial court's

14

ruling upholding the late-fee provision is correct because, like the landlords in *Star Development Corp.*, the company incurred lost time and resources in relation to the necessary administrative tasks required to collect late rent. The late charge provision here, unlike the provision in *Star Development Corp.*, does not expressly state that the fee is designed to compensate KC Live for these administrative expenses. Furthermore, to accurately analyze a lease provision, we must look at the contract as a whole. *Star Development Corp.*, 429 S.W.3d at 492. Here, the lease includes an additional provision explaining that the common area maintenance costs paid by the tenants includes an administrative fee.[3]

At trial, Mr. Nick Benjamin, a witness for KC Live, testified that "the twenty percent administrative fee, is a back-of-house overhead more specifically related to the amount of accounting time that is necessary to monitor and put together ledgers, deal with organization coding, etc." Therefore, any minimal administrative fees incurred in relation to the late payments would appear to have been compensated, in whole or in part, by the 20% administrative fee. Given that compensation for the administrative fees that KC Live asserts the late-charges provision addresses are also compensated for by the administrative-fee provision, the late-charges provision appears to compel performance rather than compensate for damages. It is also significant that, in the event of default, KC Live is *also* entitled to recover interest on any unpaid rent and its attorney fees if it is required to file an action to enforce its

---

[3] Section 1003 states, "[t]he term 'Common Area Maintenance Costs' means any and all costs and expenses of any kind incurred by Landlord in managing, maintaining, repairing, replacing, improving, operating and insuring the Common Areas, the Project, all improvements within the Project, without limitation, and an amount equal to twenty percent (20%) of the Common Area Maintenance Costs as an administrative fee. Common Area Maintenance Costs shall also include any reasonable allocation of any of the foregoing types of costs applicable to the Project and all or portions of the Development."

rights. These contractual remedies would also serve to compensate KC Live for any harms it suffered as a result of rental delinquencies.

The lease authorized KC Live to recover interest at "[a]n annual rate of interest equal to the lesser of (i) the maximum rate of interest permitted in the State of Missouri, or (ii) eighteen percent (18%)." At trial, KC Live argued that it was entitled to 10% annual interest under this provision, which it contended was "the maximum rate of interest permitted in the State of Missouri." Yet, although KC Live took the position that "the maximum rate of interest permitted" in Missouri was 10%, the late-fee provision (which compounds monthly) produces an *additional* charge of *almost 80%* on an annual basis.

Therefore, this provision is not a valid liquidated damages clause and is instead an unenforceable penalty. *See Phillips*, 468 S.W.3d at 407-08 ("Here, Lender presented no evidence suggesting that he suffered any damage from Borrower's default that would not be covered by his other contractual claims…Given the availability of these other means of recovering his damages, nothing in the evidence before the trial judge suggests that [the contractually stipulated late fee] was a 'reasonable prediction for the harm caused by the breach' or that there was some other 'harm' that was 'of a kind difficult to estimate accurately.'" (quoting *City of Richmond Heights*, 280 S.W.3d at 776)). Therefore, we grant point three and reduce the trial court's judgment to eliminate the award of damages under the late-charges provision.

16

In the fourth point, Fran's asserts that the attorney fee awards should be reversed or reduced dependent on this Court's decision on the merits of points one, two, and three. We agree.

"Absent statutory authority or contractual agreement, each litigant, with few exceptions, must bear the expense of his or her own attorney's fees." *Link v. Kroenke*, 909 S.W.2d 740, 747 (Mo. App. W.D. 1995). "If a contract provides for the payment of attorney's fees in the enforcement of a contract provision, the trial court must award them to the prevailing party." *Howe v. ALD Servs., Inc.*, 941 S.W.2d 645, 652 (Mo. App. E.D. 1997); *see Ken Cucchi Constr., Inc. v. O'Keefe*, 973 S.W.2d 520, 528 (Mo. App. E.D. 1998) ("However, even if the contract is silent on the issue, a party may only recover its fees under a contract provision if it is a prevailing party."); *see also Brown v. Brown-Thill*, 437 S.W.3d 344, 350 n.4 (Mo. App. W.D. 2014) (The contract did "not specifically require that 'the responding party' in the non-arbitral proceeding *prevail* in that proceeding." Instead, "[t]hat (implied) condition" was satisfied by the party's success in preventing the confirmation of the arbitration award and the relegation of related matters.) "A prevailing party is the party prevailing on the main issue in dispute, even though not necessarily to the extent of its original contention." *Miller v. Gammon & Sons, Inc.*, 67 S.W.3d 613, 625 (Mo. App. W.D. 2001).

Section 2701 of the lease states:

> Should Landlord file suit against Tenant for any reason, including, but not limited to, a suit for possession of the Premises, payment of Rent, damages, or to enforce or interpret the provisions of this Lease, Tenant shall reimburse Landlord for its reasonable attorneys' fees and cost of litigation, which are stipulated, if suit is for past due

17

Rent and/or money damages, to be not less than fifteen percent (15%) of the monies awarded to Landlord.

As previously stated, this Court has denied point one on the merits. Because the contract entitles KC Live to an award of attorney fees and KC Live was the prevailing party on this point, the attorney fee awards as to this matter were well within the trial court's discretion.

The attorney fee awards in connection with the liquidated damages and late charges, however, should be reduced. Because these provisions are unenforceable penalty provisions, KC Live is not the prevailing party in their enforcement and, therefore, may not receive attorney fees connected to these provisions. *See Hoag v. McBride & Son Inv. Co., Inc.*, 967 S.W.2d 157, 175 (Mo. App. E.D. 1998) (Here, the plaintiffs' primary allegation was the vesting of title of 9.5 acres of land. The "plaintiffs' prevailed only on their claim that CSSC had created a covenant in the 9.5 acre site in favor of the Riverwood landowners. Plaintiffs' were unsuccessful on their remaining five claims." Therefore, "the trial court did not err in concluding that the plaintiffs were not entitled to their attorney fees as the prevailing party."); *see also Rental Co., LLC v. Carter Grp., Inc.*, 399 S.W.3d 63, 67 (Mo. App. W.D. 2013) ("The prevailing party is the party that 'obtains a judgment from the court, regardless of the amount of damages.'…Here, the trial court ruled in favor of Carter Group on Rental Company's breach of contract claims. One way the trial court could properly find that Rental Company could be awarded attorney fees would be under the exception to the general rule for recovery of attorney fees pursuant to a contractual provision. However, Rental Company was not the prevailing party for the breach of contract claims as to each promissory note containing such contractual provision. Thus,

18

attorney fees were not properly recoverable by Rental Company under the contractual provision exception." Accordingly, the trial court erred in awarding attorney fees related to the liquidated damages and late charges provisions. On remand, the trial court should reassess the award of attorney fees and reduce the award in alignment with the lease provision.

In the fifth point on appeal, Fran's argues that KC Live failed to allocate between fees incurred on its contract and tort claims. Relatedly, Fran's contends that the lease permits recovery only where the landlord files suit against the tenant and thus does not permit recovery of fees incurred to defend counterclaims or monitor third party claims. We disagree.

Trial courts are considered experts on the topic of awarding attorney fees. *O'Brien v. B.L.C. Ins. Co.*, 768 S.W.2d 64, 71 (Mo. banc 1989). Trial courts may therefore award attorney fees without the aid of evidence. *Walsh v. City of Kansas City*, 481 S.W.3d 97, 113 (Mo. App. W.D. 2016); *see also Essex Contracting, Inc. v. Jefferson Cnty.*, 277 S.W.3d 647, 656-57 (Mo. banc 2009). Accordingly, the failure to allocate or segregate is generally not fatal to the prevailing party's award of attorney fees. *Magruder v. Pauley*, 411 S.W.3d 323, 336-37 (Mo. App. W.D. 2013); *see also Envtl. Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.*,178 S.W.3d 691, 711-12 (Mo. App. S.D. 2005).

Fran's cites *Funding Systems Leasing Corp. v. King Louie International, Inc.,* 597 S.W.2d 624 (Mo. App. W.D. 1979), to support its position that allocation among claims is a requirement when attorney fees are recoverable. In *King Louie*, the prevailing party supplied "no proof of any allocation" regarding fees associated with

19

defending its claims against one party and enforcing its claims against another. *King Louie*, 597 S.W.2d at 637. In this case, however, KC Live went beyond what was required by submitting billing records that detailed its fees, services, and comparable rates. The trial court also set forth the calculations underlying its award. More importantly, however, *King Louie* is inapplicable to cases such as this one where "the damages against each defendant . . . are identical and indivisible." *Brockman v. Soltysiak*, 49 S.W.3d 740, 746 (Mo. App. E.D. 2001), *overruled on other grounds*, *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 40 (Mo. banc 2013).

Fran's argument hinges on its contention that KC Live's affirmative claims for breach of the lease, and Fran's counterclaims for fraud and negligent misrepresentation, were entirely separate from one another. But this assertion is inaccurate. Fran's asserted fraudulent procurement, and unconscionability, as affirmative defenses to KC Live's contract claims. (We presume Fran's "unconscionability" defense relied on similar facts to the "predatory leasing scheme" it alleged in its counterclaim.). Fees for litigating Fran's affirmative defenses plainly fall within the contractual fee-shifting provision.

Fran's also argues that the lease permits recovery only when the landlord files suit against the tenant. As such, Fran's asserts that KC Live may not recover attorney fees incurred in conjunction with the counterclaims. In general, "[a] party cannot litigate tenaciously and then be heard to complain about the time necessarily spent overcoming its vigorous defense." *Weitz Co. v. MH Washington*, 631 F.3d 510, 530 (8th Cir. 2011) (quoting *Williams v. Fin. Plaza, Inc.*, 78 S.W.3d 175, 187 (Mo. App. W.D. 2002)). In *Weitz*, the eighth Circuit applied Missouri law and determined that

20

the prevailing party could recover attorney fees on counterclaims—even if the party had failed to prevail on those specific claims. 631 F.3d at 518. Here, Fran's brought two tort counterclaims, fraud in the inducement and negligent misrepresentation. As previously explained, the claims at issue are not independent because they arise from the lease. Therefore, attorney fees associated with counterclaims may be granted if permitted by the language of the lease.

Section 2701 of the lease specifically provides that "[s]hould Landlord file suit against Tenant for any reason . . . Tenant shall reimburse Landlord for its reasonable attorneys' fees and cost of litigation. . . ." Litigation means "[t]he process of carrying on a lawsuit." *Lawsuit*, Black's Law Dictionary (10th Edition 2014). As such, the defense of counterclaims and associated costs fall directly within this lease provision.

In sum, KC Live provided sufficient information for allocation, and the language of the lease permits recovery on fees for claims arising from the lease. Point five is denied.

**Conclusion**

The trial court was correct in ruling that Fran's waived its right to a jury trial on its counterclaims by accepting the lease provision waiving the right to a jury trial. The trial court was incorrect in ruling that the liquidated damages clause relating to the cessation of business operations for three consecutive days was valid. The trial court also erred in ruling that the late charges provision was a valid liquidated damages provision because this provision is designed to compel performance as evidenced by the fact that the harm it claims to compensate is compensated by another lease provision. Therefore, we grant these points and remand to the trial

21

court where the judgment should be reassessed and reduced to reflect the removal of damages awarded under these provisions. The award of attorney fees relating to these provisions must also be reversed and recalculated.

/s/ THOMAS H. NEWTON

Thomas H. Newton, Judge

Gabbert, P.J., and Ahuja, J. concur.