LUCK "E" STRIKE CORPORATION, Plaintiff–Appellant,

v.

FIRST STATE BANK OF PURDY, Defendant–Respondent.

No. 24166.

Missouri Court of Appeals, Southern District, Division Two.

March 29, 2002.

Motion for Rehearing or Transfer Denied April 22, 2002.

J. Michael Riehn, Cassville, for appellant.

John A. Cowherd, Mt. Vernon, for respondent.

PHILLIP R. GARRISON, Presiding Judge.

This case involves a dispute between a borrower, Luck "E" Strike Corporation ("Plaintiff"), and a lender, First State Bank of Purdy ("Defendant"), concerning the payment of late fees on certain loans. Plaintiff asserts that no late fees are due and owing, and filed a petition for declaratory judgment to prevent the assessment and collection of such late fees.

On July 8, 1994, Plaintiff borrowed $1,652,000 from Defendant through three separate Small Business Administration ("SBA") loans with different maturity dates. Loan number 788–323 was in the principal amount of $602,000 with interest at the rate of 9.25% per annum, and was to be paid in monthly installments of $6,196 with the full balance of principal and interest payable fifteen years from the date of the note. Loan number 788–331 was in the principal amount of $650,000 with an interest rate of 9.25% per annum, and was to be paid in monthly installments of $10,540 with the full balance of principal and interest payable seven years from the date of the note. Loan number 788–349 was in the principal amount of $400,000 with interest at the rate of 9.25% per annum, and the full balance of principal and interest was to be paid one year from the date of the note.

On July 8, 1994, Plaintiff also executed a loan agreement with Defendant pertaining to the loans. The loan agreement provided that "[n]o modification, consent or waiver of any provision of this Agreement, nor consent by Lender to any departure by Borrower therefrom, shall be effective unless the same shall be in writing and signed by an officer of Lender." At or near the same time, Plaintiff and SBA executed a separate authorization and loan agreement. In the loan agreement executed by Plaintiff and SBA was a provision which provided:

> The undersigned agrees to pay a late charge not exceeding five (5) percent of the installment amount due if such installment is not received within ten days of the due date. Funds received from the undersigned will be applied first to interest to the date of receipt, then to principal and then to the late fee.

From July 8, 1994 through July 1996, Plaintiff experienced difficulty in paying the amounts due under the loans. Ann Hall ("Hall"), Defendant's bank president, testified regarding the amount of late fees claimed by Defendant under loan numbers 788–323, 788–331, and 788–349. According to Hall, there were forty-two late payments under loan number 788–323. This resulted in forty-two late fees of $309.80 each, for a total late fee of $13,011.60. Hall testified that there were forty-one late payments under loan number 788–331, which resulted in thirty-nine late fees of $527 each and two late fees of $492.81 each, for a total late fee of $21,538.62. She also testified that there was one late payment under loan number 788–349, which resulted in a late fee of $429.88. Thus, at the time suit was filed, the late fees claimed by Defendant totaled $34,980.10.

In an attempt to rectify this problem, Plaintiff and Defendant entered into two separate modification agreements regard-

ing loan numbers 788–323 and 788–331 on July 15, 1996. Under the agreements, Plaintiff acknowledged that it had failed to make loan payments for the months of February, March, April, May, and June 1996, and Defendant agreed to defer these payments until the maturity of the two loans. In light of the parties' agreement to defer the loan payments for the months of February through June 1996, Hall acknowledged that late fees should not have been charged for those five months and agreed that Defendant's records were in error in including those late fees. In light of that admission, the trial court found that the amount of late fees claimed by Defendant should be reduced by $4,149.81.

The trial court found that in October 1997, the parties agreed that Plaintiff's loan payments would be automatically withdrawn by Defendant to pay the loan balances. However, it was Defendant's policy that the automatic withdrawals were not to be used to pay late fees. Further, Defendant's policy was to pursue the payment of late fees at a later date, usually at the end of the term of the promissory note. Hall testified that "if somebody is having a problem making a payment, they're having a problem, and we're not going to add to their … misery by taking late charges. We just let those go at the end, and we assume we'll get them eventually." Hall further testified that late fees are treated separately and "are never added to the balance of the loan. They are kept as a separate line item in our computer." Hall explained that Defendant treats requests for loan balances differently than requests for loan payoffs. She noted that the loan balance is the principal balance owed on the note whereas the loan payoff includes the amounts owed for principal, interest, late fees, and per diem.

The only request for a loan payoff received by Defendant was a letter from Plaintiff's new lender, First International Bank. After receiving a letter from First International Bank dated December 22, 2000, which requested the payoff, Defendant provided the loan number, the current principal balance, the interest, the late charges, the fee for a deed of release, the date the payoff "was as of," and the per diem.

Hall testified that there were several discussions between John Hendrix ("Hendrix"), Plaintiff's company president, and Chip Lawson ("Lawson"), a bank officer, regarding late fees. She stated that she had no knowledge of Lawson ever informing Hendrix that late fees had been waived. She further testified that Lawson would have had neither the permission to waive the late fees nor the authority to do so. Hall also testified that she was personally involved in discussions with Hendrix regarding the waiver of late fees, and that Defendant and Hendrix were involved in "ongoing discussions" regarding late fees over the last year of the loans. Hall stated that during those discussions she neither orally nor in writing waived Defendant's right to claim late fees under the loans to Plaintiff.

Hendrix testified that his company had been looking for almost a year to refinance its debt with Defendant. Hendrix admitted that he knew, prior to the refinancing of his company's debt, that Defendant was claiming late fees. Hendrix testified that he knew that Defendant was "claiming some alleged late charges, and I—and all the time realizing that they don't show up on what I owe or anything because that's going to be their bargaining power to keep me at the bank, because of the way their system works they had them on their printouts." Hendrix also testified that approximately five or six months prior to January 2001, he met with Lawson and Glen Garrett ("Garrett"), the bank's own-

er, and discussed late fees. Hendrix stated that he found out earlier that Defendant was claiming late fees when he was talking to Lawson about refinancing and was informed by one of Defendant's employees that there was "another charge out there." Gary Shaffer, Plaintiff's chief financial officer, also testified that he "had heard conversations" regarding late charges claimed by Defendant, but that he could not recall when he had heard those conversations.

In its judgment, the trial court found that Defendant was not entitled to collect late fees after October 1997 since it had the authority to make automatic withdrawals for loan payments, and therefore reduced Defendant's claim by $8,270.88. After all credits were given, the trial court found that Defendant was entitled to retain from the cash bond posted by Plaintiff the sum of $22,579.31 for late fees, plus an additional $1,500 for attorney fees, for a total of $24,079.31.[1]

Regarding attorney fees, the trial court noted that the three promissory notes executed by Plaintiff provided for the payment of "reasonable attorney's fees and costs, which Holder may deem necessary or proper in connection with the satisfaction of the Indebtedness." The trial court found that the efforts of Defendant's attorney in attempting to collect the late fees charged were efforts undertaken "in connection with the satisfaction of the Indebtedness," and concluded that Defendant was entitled to recover "reasonable attorney's fees" in the amount of $1,500.

In its sole point on appeal, Plaintiff contends that the trial court erred in entering its judgment because it was contrary to the weight of the evidence adduced at trial, was not supported by substantial and competent evidence, and it erroneously declared and applied the law. Specifically, Plaintiff argues that it does not owe late fees and/or collection costs because Defendant waived its right to collect any late fees and/or collection costs, or that Defendant is now barred by either equitable estoppel or laches from collecting any late fees and/or collection costs.

■ Appellate review of bench-tried cases is governed by the principles established in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[2] The judgment of the trial court will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.*

■ Waiver is the intentional relinquishment of a known right. *Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384, 386 (Mo. banc 1989). A waiver may be made expressly or may be implied from conduct. *Mark Twain Bank v. Jackson*, 901 S.W.2d 360, 363 (Mo.App. W.D.1995). However, for a waiver to be implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right. *Heintz v. Swimmer*, 811 S.W.2d 396, 399 (Mo.App. E.D. 1991). "To rise to the level of a waiver, ... actions must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of [the] conduct is possible." *Waterwiese v. KBA*

---

1. As part of an agreement entered into on December 29, 2000 between Plaintiff and Defendant, Plaintiff had agreed to post a $35,000 cash bond in an escrow account at Defendant's bank.

2. *Murphy* interpreted the provisions of Rule 73.01(c). The provisions of that Rule now appear in essentially the same form in Rule 84.13(d), Missouri Rules of Civil Procedure (2001).

*Constr. Managers, Inc.,* 820 S.W.2d 579, 585 (Mo.App. E.D.1991).

In the instant case, both the loan agreement between Plaintiff and Defendant and the SBA authorization and loan agreement required all waivers to be in writing. The loan agreement between Plaintiff and Defendant stated that "[n]o modification, consent or waiver of any provision of this Agreement, nor consent by Lender to any departure by Borrower therefrom, shall be effective unless the same shall be in writing and signed by an officer of Lender." The SBA authorization and loan agreement also provided that "[n]o provision stated herein shall be waived without the prior written consent of SBA." No evidence was submitted at trial of a written waiver of Defendant's right to collect late fees.

Although there was no written or express waiver of Defendant's right to collect late fees, Plaintiff contends that Defendant has implicitly waived its right to collect late fees. Plaintiff argues that the two modification agreements, the loan balance documents provided by Defendant to Plaintiff, an auditor's statement prepared by Defendant and submitted to Plaintiff's auditors, and an alleged statement by Garrett that he would "take care of the problem" show that Defendant implicitly waived its right to collect the late fees.

Plaintiff argues that the modification agreements entered into by Plaintiff and Defendant, which deferred the payment of five monthly installments, are silent as to the issue of late fees and that this amounts to a waiver. However, the modification agreements provide that Plaintiff will "comply with the other terms of said promissory note and deed of trust." Furthermore, they also provide that "as modified by this agreement the promissory note is hereby ratified and confirmed."

Plaintiff also contends that the information given to it and its auditor by Defendant regarding the balances due under its loans did not include the amount owed for late fees. However, as Hall explained at trial, the term "balance" meant the amount of principal balance owed on the loan and did not include the amounts owed for late fees. Hall testified that late fees are treated separately and "are never added to the balance of the loan. They are kept as a separate line item in our computer." Hall explained that Defendant treats requests for loan balances differently than requests for loan payoffs. She noted that the loan balance is the principal balance owed on the note whereas the loan payoff includes the amounts owed for principal, interest, late fees, and per diem. When a payoff was requested in December 2000, Defendant did provide the amount owed for late fees. Therefore, the fact that Defendant did not include the amount of late fees that were due in various documents cited by Plaintiff does not indicate that Defendant intended to waive those fees.

■ Plaintiff also argues that Garrett waived Defendant's right to collect late fees by stating to Hendrix that he would "take care of the problem." The trial court, however, had the right to believe all, part, or none of Hendrix's testimony regarding his discussion with Garrett. *See Meyer v. Lofgren,* 949 S.W.2d 80, 82 (Mo. App. W.D.1997). Furthermore, as the trial court found, it was clear that following Hendrix's and Garrett's conversation and up to a year prior to the payoff of Plaintiff's notes, there were "ongoing discussions" with Defendant's officers regarding the payment of late fees. This is not consistent with Plaintiff's claim that there was a waiver by Defendant of its right to collect late fees. *See Mark Twain Bank,* 901 S.W.2d at 363 (holding that the bank

had not implicitly waived its right to claim late fees where following the alleged waiver, various conversations and meetings were held concerning the issue of late charges).

In sum, Plaintiff has failed to demonstrate that the trial court erred in failing to find for Plaintiff on the issue of Defendant's alleged intentional relinquishment of its right to charge and collect late fees. This portion of Plaintiff's point is therefore denied.

Plaintiff next contends that Defendant is "equitably estopped" from collecting late fees "based upon the representations of [Defendant] and [Defendant's] conduct." Estoppel requires proof of (1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act. *Brown*, 776 S.W.2d at 386. The existence of reliance is a necessary element of equitable estoppel. *Heintz*, 811 S.W.2d 396 at 399.

In the instant case, there was no admission, statement, or act by Defendant that was inconsistent with its claim for late fees. The trial court found that the issue of late fees was "an area of disagreement between the parties." Hall testified that Hendrix had repeatedly requested a waiver of late fees, but that no such waiver had been agreed to by her or by any representative of Defendant. Additionally, the trial court noted that Hendrix testified that he knew Defendant claimed late fees were due, but that "he didn't think he would have to pay them." This evidence is also inconsistent with Plaintiff's contention that it in good faith relied upon such a waiver to its detriment. Additionally, the only injury claimed by Plaintiff is that it will

end up paying late fees, per the terms of the promissory note, to Defendant. It is not claiming, nor did it prove, any other alleged injuries. Given the evidence presented, Plaintiff has failed to show a valid defense of estoppel.

Plaintiff also argues that Defendant's claim for late fees is barred by the doctrine of laches. Invocation of the laches doctrine requires that a party with knowledge of the facts giving rise to his rights delays assertion of them for an excessive time and the other party suffers detriment therefrom. *Ward v. Hudgens*, 22 S.W.3d 260, 264 (Mo.App. S.D.2000). In order for delay to support the doctrine of laches, it must be unreasonable and unexplained and must be shown to have caused disadvantage and prejudice to the defendant. *Id.* Laches, however, is not a favored doctrine and equity does not encourage its invocation to defeat justice, but only to prevent injustice. *Id.*

Here, the evidence does not establish that Defendant had engaged in an unreasonable delay in the assertion of its right to collect late fees. Hall testified that Defendant often waited to collect late fees until the end of the term of the note. No evidence was introduced to show that this practice was unreasonable. The evidence further showed that Defendant's claim for late fees occurred at least five to six months prior to the payoff of the notes by Plaintiff. Therefore, Defendant made claim to the late fees even before the end of the term of the notes. Furthermore, Plaintiff has suffered no detriment as a result of the Defendant's alleged delay in the collection of late fees. As Defendant did not charge interest on the late fees incurred, Defendant's delay in the collection of the late fees was a benefit to Plaintiff rather than a detriment. Consequent-

ly, this portion of Plaintiff's point must also fail.

■ Plaintiff also contends that Defendant is not entitled to recover attorney's fees. First, Plaintiff argues that any attorney's fees that Defendant incurred in this matter were incurred in defending against Plaintiff's petition for a preliminary injunction, its petition for a permanent injunction, and its petition for a declaratory judgment. Plaintiff asserts that Defendant is not entitled to collect attorney's fees since it did not file "any counterclaim where it is seeking affirmative relief in its attempt to collect late fees." Plaintiff, however, cites no authority for this proposition. Arguments without authority present nothing for review. *See Asbury v. Crawford Elec. Co-op., Inc.*, 51 S.W.3d 152, 158–59 (Mo.App. S.D.2001).

■ Additionally, Plaintiff argues that Defendant should not be awarded attorney's fees since Defendant attempted to collect late fees for the months of February through June 1996. However, Defendant, at trial, admitted that it was not seeking late fees for these months. The trial court also reduced the amount of attorney's fees requested by Defendant from approximately $2,500 to $1,500, as the trial court found that it "would not be fair or reasonable to require that Plaintiff pay the full amount of these fees."

The trial court also noted that the contractual provision in the three loans executed by Plaintiff provided for the payment of "reasonable attorney's fees and costs, which Holder may deem necessary or proper in connection with the satisfaction of the Indebtedness." The trial court found that the efforts of Defendant's attorney in attempting to collect the late fees charged were efforts undertaken "in connection with the satisfaction of the Indebtedness," and concluded that Defendant

was entitled to recover "reasonable attorney's fees."

■ The trial court is vested with broad discretion in awarding attorney's fees, and an award will be reversed only upon finding an abuse of discretion. *Ruzicka v. Hart Printing Co.*, 21 S.W.3d 67, 73 (Mo.App. E.D.2000). Where a contract provides for the payment of attorney's fees and expenses incurred in the enforcement of a contract provision, it is error to fail to make such an award to the successful party. *Id.* Consequently, we cannot say that the trial court abused its discretion in awarding Defendant attorney's fees. This portion of Plaintiff's point is denied.

The judgment of the trial court is affirmed.

PARRISH and RAHMEYER, JJ., concur.