

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| RANDY ROBB, et al., | ) | |
| Appellant-Respondents, | ) | **WD81562** |
| v. | ) | **Consolidated with WD81601** |
| | ) | |
| BOND PURCHASE, L.L.C., | ) | **FILED: June 25, 2019** |
| Respondent-Appellants. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY
### THE HONORABLE JANET SUTTON, JUDGE

### BEFORE DIVISION ONE: VICTOR C. HOWARD, PRESIDING JUDGE,
### LISA WHITE HARDWICK AND GARY D. WITT

This appeal and cross-appeal arise from a judgment entered in favor of Randy Robb and his related corporate entities[1] (collectively "Robb") on breach of contract and tort claims brought against Bond Purchase, LLC and its majority owner David Johnson ("collectively, Bond"). Bond brings nine points on appeal challenging the circuit court's award of $34,353.29 in damages to Robb and the denial of Bond's counter-claims. Robb cross-appeals with two points challenging the circuit court's

---

[1] Robb's related corporations are Hillcrest, Inc., Thistle Hill Development, Inc., and Crest Construction, Inc. This opinion collectively refers to Randy Robb and his related corporate entities as "Robb" because their interests, for purposes of this case, are singular. When necessary to show individual action, we will refer to the specific corporations by name and to Randy Robb as "Randy."

calculation of damages. For reasons explained herein, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL HISTORY

On October 7, 2011, Bond executed a promissory note ("the 2011 Hillcrest Note") loaning $150,000 to Robb through his corporate affiliate, Hillcrest, Inc. ("Hillcrest"). The note provided that the maturity date of the loan would be April 7, 2012, and that Robb would make monthly, interest-only payments at a rate of 12%. The note was secured by a second deed of trust against a commercial strip center property owned by Hillcrest and provided for multiple remedies, including increased interest rates and late fees, if Hillcrest were to default on its terms.

Robb did not make the maturity payment as required by the terms of the 2011 Hillcrest Note on the April 7, 2012, due date. In a letter addressed to Robb dated July 27, 2012, one of Bond's minority owners and bookkeeper, John Alvey, wrote that Robb had "paid a $750 extension fee and agreed that Hillcrest will begin to make payments toward principal." The letter requested that a $50,000 principal reduction be made with Robb's September payment. Robb, instead, made two $25,000 payments for principal reductions, one in December 2012 and another in July 2014, and consistently paid monthly interest at the 12% rate originally specified. Bond issued monthly statements recognizing these payments of principal and interest, without assessing any late fee or increase in interest. These statements were provided until at least June 29, 2015.

2

On or about July 15, 2014, Bond and Robb executed three new promissory notes ("collectively, the 2014 Notes") involving Robb's corporate affiliates. In these notes, Bond extended an additional $40,000 to Hillcrest, $75,000 to Thistle Hill Development, Inc. ("Thistle"), and $57,000 to Crest Construction, Inc. ("Crest). These notes all had a maturity date of July 15, 2017, and provided that Robb would pay yearly, interest-only payments at a rate of 10%. These notes had similar provisions concerning Bond's rights if Robb were to default on the terms of the loan. Each promissory note was secured by a security agreement pledging shares of Clay County Savings Bank Financial Corp. ("CCSB") stock. Robb pledged 23,007 CCSB shares in total, assigned as follows: 5,332 shares from Hillcrest, 10,000 shares from Thistle, and 7,675 shares from Crest. The parties agreed that the Hillcrest shares would cross-collateralize the 2011 Hillcrest Note.

The total interest payment of $17,200 owed on the 2014 Notes was not made on the due date of July 15, 2015. Robb, however, remained current during this time on the 2011 Hillcrest Note, making 12% interest payments in June, July, and August of that year. After the interest on the 2014 Notes was not timely tendered, Robb notified Alvey, who in turn informed Johnson, that he was contemplating selling the CCSB shares securing the four notes to satisfy the corporate entities' indebtedness to Bond. On August 5, 2015, Johnson sent an email to Robb asking for confirmation that Robb was interested in selling the stock and inquired into the potential buyer's identity and offer price. Ten days later, and after Robb attempted to set up a meeting with Johnson, Johnson sent another

3

email recognizing that Robb had made the June interest payment for the 2011 Hillcrest Note but still owed outstanding interest on the 2014 notes. In that email, Johnson calculated the total outstanding balance on all four notes at $289,200, as of July 15, 2015, and offered to reduce the total amount owed to $60,000 if Robb agreed to sign over the 23,007 shares securing the four notes at $10.00 per share.[2]

In September 2015, Robb met with the president of CCSB and Clay County Savings Bank ("the Bank"), Mario Usera, to inquire if the Bank would be willing, as had been its usual practice, to buyback the stock issued to Robb. Usera expressed interest in the arrangement because the negotiated $11.00 per share price was two or three dollars less than the book value of the stock and CCSB shares were traded infrequently and were rarely, if ever, available in such large blocks. Consequently, Usera agreed in principle that the Bank would purchase the shares if Robb could provide an official accounting of the pay-off amount necessary to take the shares free and clear of Bond's security interest.

Robb thereafter met with Alvey on September 18, 2015, and requested that Bond provide loan pay-off statements. Alvey did not provide any such statement. Instead, on September 24, 2015, at the direction of Johnson, Alvey sent Robb a notice informing Robb that all four notes were in default and Bond was exercising

---

[2] We recognize that the August 2015 email misstated the total shares held as collateral for the four promissory notes. Johnson's email stated that Bond held a total of 23,005 shares. This misstatement has no bearing on the issues before this Court.

4

its right to impose the increased default interest rate of 21% and to accelerate all sums of outstanding principal, late fees, and accrued interest.

On October 8, 2015, Robert Thomson, another minority owner of Bond and the company's in-house attorney, notified Robb that Bond intended to sell the CCSB stock at a Uniform Commercial Code ("UCC") foreclosure sale. The notification included the notice of default sent previously by Alvey and both letters provided that "You are entitled to an accounting of the unpaid indebtedness secured by the Collateral that is intended to be sold. You may request an accounting by calling us . . . ." After receiving this notice, Robb attempted to contact Bond and Thomson several times, both by phone and by appearing in person at Thomson's office. Bond repeatedly failed to provide the requested statements of accounting.

In the absence of the requested pay-off statements, Robb and Usera agreed that CCSB would loan Robb the funds to discharge his indebtedness, on the condition that Bond would release the CCSB shares free and clear of any lien. CCSB agreed that it would then repurchase the stock at $10.00 per share. CCSB estimated the pay-off amount for the four notes would total $312,000. This calculation included the default interest, but did not include any fees that might have arisen from administering the note and alleged default. Accordingly, CCSB authorized Robb to borrow no more than $325,000, which CCSB believed would cover both the balance of the loan and any additional reasonable fee or charge that was assessed by Bond.

5

Bond did not provide a pay-off statement until December 9, 2015, which was three business days prior to the scheduled date of the December 15, 2015, foreclosure sale. The pay-off was calculated as of December 4, 2015, and totaled $432,238. This was a $120,238 difference from CCSB's estimated pay-off amount and resulted from Bond's assessment of the following additional charges: (1) a $7,500 late fee on the full $150,000 principal balance of the 2011 Hillcrest Note, which was compounded monthly at an interest rate of 21%; (2) a default interest rate of 21% on the $150,000 principal balance from April 7, 2012; (3) a combined late fee charge of $9,972 on the 2014 Notes; and (4) $27,249.00 in legal fees for work related to the note completed by Thomson and outside counsel at Dentons US LLP.

CCSB refused to authorize the additional $120,238 necessary for the release and Thistle and Crest's shares were sold at the foreclosure sale for $71,000 and $54,000, respectively, while the sale of Hillcrest's shares were stayed by Chapter 11 bankruptcy proceedings. Bond subsequently purchased Hillcrest's shares for $54,632.50 at a Chapter 11 bankruptcy sale.

After the sale of Thistle and Crest's shares at the foreclosure sale and Bond's acquisition of Hillcrest's shares, Bond continued to assert that Robb had an outstanding balance remaining on the notes. Consequently, Robb made a payment of $228,730.61 to prevent the foreclosure sale of the commercial strip center property that originally secured the 2011 Hillcrest Note. Both parties, however, reserved the right to assert claims against one another.

Robb filed a petition in circuit court seeking a declaratory judgment regarding amounts owed under the promissory notes and asserting claims against Bond for breach of implied covenant of good faith and tortious interference. Bond filed counterclaims seeking a deficiency judgment based on Robb's alleged breach of the promissory notes and guaranties. Following a bench trial in October 2017, the circuit court determined, *inter alia*, that Bond had breached the implied covenant of good faith and fair dealing, tortiously interfered with Robb's contract or business expectancy, and had disposed of the shares securing the notes in a commercially unreasonable manner. Further, the court ruled that Bond was not entitled to any deficiency judgment and, instead, entered judgment in favor of Robb, awarding $34,353.29 in damages. The court subsequently denied Robb's motion to amend the judgment. Bond appeals and Robb cross-appeals.

## STANDARD OF REVIEW

"On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. banc 2014) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). While we defer to the circuit court's factual findings, the court's legal conclusions and application of law to fact are reviewed

7

*de novo*. *Zweig v. Metro. St. Louis Sewer Dist.*, 412 S.W.3d 223, 231 (Mo. banc 2013).

The interpretation of a contract presents a question of law subject to our *de novo* review. *Belton Chopper 58, LLC v. N. Cass Dev., LLC*, 496 S.W.3d 529, 532 (Mo. App. 2016). "When we conduct a de novo review, 'the judgment may be affirmed on an entirely different basis than that presented to the trial court' and 'can be affirmed on any theory that is supported by the record.'" *Id.* (quoting *Hensley–O'Neal v. Metro. Nat. Bank*, 297 S.W.3d 610, 614 (Mo. App. 2009)).

**ANALYSIS**

**I. Bond's Appeal**

**A. Modification of Promissory Note**

In Point I, Bond contends that the circuit court erred in relying on the July 27, 2012, letter and testimony regarding an extension of the 2011 Hillcrest Note because such evidence of modification violated the Statute of Frauds. As codified at Section 432.047.2, RSMo Cum. Supp. 2012,[3] the Missouri Commercial Credit Agreement Statute of Frauds, precludes actions and defenses on a credit agreement, regardless of the legal theory, unless the underlying agreement is in writing.

We cannot consider the merits of this argument because Bond failed to preserve it for appeal. Despite pleading an affirmative defense for statute of

---

[3] All statutory references are to the Revised Statutes of Missouri as updated by the 2012 Cumulative Supplement.

8

frauds, Bond did not object at trial when Robb presented the July 27, 2012, letter evidencing the extension between the parties and testimony about the terms of the oral modification. Even when the statute of frauds is properly pled, "failure to object to offered evidence of the oral agreement constitute[s] a waiver of the protection of the statute." *Crawford v. Detring*, 965 S.W.2d 188, 192 (Mo. App. 1998) (internal citation and quotations omitted).[4] Because there was no contemporaneous objection at the time Robb presented evidence of an oral modification, Bond waived its statute of frauds defense under Section 432.047.2 and, consequently, preserved nothing for appeal. Bond's first point is denied.[5]

In its second point on appeal, Bond argues that the circuit court erred in finding that it waived enforcement of terms in the 2011 Hillcrest Note prior to its formal notice of default because, even if Section 432.047.2 did not preclude Robb's actions and defenses, the plain language of the note required that any modification or waiver of its terms be specifically set forth in writing. Bond contends that nothing in the record reveals a written waiver expressing any forfeiture of its right to enforce the terms of the note.

The waiver provision of the 2011 Hillcrest Note stated, in pertinent part:

---

[4] While *Crawford* addressed the general statute of frauds, our determination that Bond has failed to preserve its first allegation of error is consistent with the general rule that in order to preserve an issue for appeal the party must make a timely and specific objection at trial stating the particular grounds it later seeks to advance on appeal. *See Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 816 (Mo. App. 2008).

[5] Bond's sub-argument in its first point on appeal – asserting that because Hillcrest failed to make a $50,000 principal payment by the date requested in the modification letter, Bond was released of any contractual obligation set forth in the alleged modification – also was not preserved and is improper because it was not raised in the Point Relied On. Rule 84.04(e).

No delay or omissions by Lender to exercise any right, remedy, privilege or power hereunder or under any other Loan Document shall impair such right, remedy, privilege or power or be construed to be a waiver of any default or acquiescence therein, and any single or partial exercise of any such right, remedy, privilege or power shall not preclude other or future exercise thereof or the exercise of any other right, remedy, privilege or power, and no waiver whatsoever shall be valid unless in writing signed by Lender, and then only to the extent in such writing specifically set forth. All remedies herein or by law afforded shall be cumulative and not alternative, and all shall be available to Lender until this Note has been paid in full.

The circuit court determined that Bond had either waived its right to enforce the promissory note or was estopped from doing so prior to formal notice of default because Bond directed Alvey to send monthly written acknowledgments recognizing that the maturity date for the note had been extended, that timely interest payments were paid by Robb, and that two principal reductions had been made. The circuit court also found that these letters included reminders of the due date for the next 12% interest rate payment and noted the remaining principal balance, without ever referencing or imposing the $7,500 late fee or the 21% interest rate.

"Waiver is the *intentional* relinquishment of a known right." *Horne v. Ebert*, 108 S.W.3d 142, 147 (Mo. App. 2003) (emphasis in original). "Where there is no express declaration of waiver, there must be a clear, unequivocal, and decisive act showing waiver implied by conduct." *Star Dev. Corp. v. Urgent Care Assocs., Inc.*, 429 S.W.3d 487, 494 (Mo. App. 2014) (internal citation and quotations omitted). "While a party's conduct can result in waiver of a contractual right, the conduct

10

must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of [the] conduct is possible." *Horne*, 108 S.W.3d at 147 (alteration in original) (internal citations and quotations omitted).

The record supports the circuit court's determination that Bond's course of conduct expressly evidenced an intent to extend the contract with Robb and temporarily waive its rights upon default. The first of the letters sent from Alvey, stated:

> Please see the attached calculation showing $200.00 of unpaid interest. The schedule also calculates the interest due on August 7th and September 7th.

> You also paid a $750.00 extension fee and agreed that Hillcrest will begin to make payments toward principal. Accordingly, please make a $50,000 principal payment with the September 7, 2012 payment.

Bond continued to express approval of the extension in subsequent letters by referencing payments either paid or owed by Robb at 12% interest, while never expressing Bond's intention to reserve the right to call the note in default. Bond argues that the waiver provision of the original promissory note, set forth *supra*, requires that we find that the text of the letters insufficient to waive the right to enforce a late fee and default interest because they do not contain a specific, *written* waiver of those rights.

In support of its contention, Bond cites *Luck "E" Strike Corp. v. First State Bank of Purdy*, 75 S.W.3d 828, 830 (Mo. App. 2002), wherein a borrower

11

executed a loan agreement on three separate Small Business Administration loans. The loan agreement had a waiver provision similar to Bond's that required all modifications or waivers to be evidenced in writing to be effective. *Id.* Shortly after executing those agreements, the borrower had difficulty making timely payments and incurred approximately 82 late fees totaling nearly $35,000. *Id.* Attempting to avoid additional late fees, the borrower executed two modifications that deferred certain missed payments until the maturity date of two of the loans. *Id.* at 830-31. After another lender requested the pay-off amount from First State Bank, the borrower received pay-off amounts that included several late fees, which the borrower contended had been assessed in error because First State Bank had waived its right to collect such fees. *Id.* at 831-32.

The borrower in *Luck "E" Strike* averred "that the two modification agreements, the loan balance documents provided by [First State Bank to the borrower], an auditor's statement prepared by [First State Bank] and submitted to [the borrower's] auditors, and an alleged statement by [an agent of First State Bank] that he would 'take care of the problem' show[ed] that [First State Bank] implicitly waived its right to collect the late fees." *Id.* at 833. In denying the borrower's assertion however, the appeals court found these allegations were insufficient to demonstrate waiver because the First State Bank had repeatedly expressed its intention to collect late fees, *under the terms of the original loan agreements*, throughout the modification process. *Id.* Importantly, the modification documents provided that the borrower would "comply with the other

12

terms of said promissory note and deed of trust[,]" and that the note "as modified by this agreement . . . is hereby ratified and confirmed." *Id.* Further, unlike the circumstances presented here, the *Luck "E" Strike* court specifically noted the borrower's testimony that it was aware of the late fees prior to receiving the bank's pay-off documents and that it had engaged in "ongoing discussions" regarding the payment of late fees throughout the modification process. *Id.*

While *Luck "E" Strike* supports Bond's proposition that a lender need not continually and explicitly reiterate its intention to reserve contractual remedies, *Id.* at 834-35, it should not be read to mean that a contract with a no-oral waiver provision creates an unassailable firewall against future oral waiver. Indeed, the circuit court properly recognized that "[p]arties to a contract cannot, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement." *Fritts v. Cloud Oak Flooring Co.*, 478 S.W.2d 8, 14 (Mo. App. 1972) (alteration in original) (internal citation and quotations omitted). This remains true even if the subsequent agreement is made orally and, "[i]n like manner, a provision that an express condition of a promise or promises in the contract cannot be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective." *Id.* (internal citation and quotations omitted).

Here, the court had evidence of a second agreement or modification expressing an intention to extend the original note, which was subsequently supported by the oral testimony of Robb without objection from Bond. Thus, the circuit court reasonably determined that the letters and testimony evidenced Bond's

13

intent to waive its enforcement rights triggered upon Robb's default until Bond reasserted its intention to enforce those rights under the note. Bond correctly argues that Missouri law allows commercial creditors to informally accommodate delinquent debtors without waiving their bargained-for remedies*, see Bancorpsouth Bank v. Paramont Properties, L.L.C.*, 349 S.W.3d 363, 368 (Mo. App. 2011), but that does not mean that a commercial creditor may *never* waive enforcement of a contractual remedy. *See Fritts*, 478 S.W.2d at 14. Where, as here, the commercial creditor does not make a contemporaneous objection to the admission of properly offered evidence of waiver, it would be improper to require the court to categorically ignore conduct expressly indicative of such waiver. Bond's second point is denied.

### B. Late Fees

Bond's next two points on appeal address the late fee clause of the 2011 Hillcrest Note. In Point III, Bond avers that the circuit court erred in determining that the late fee clause could only be applied to regular interest payments and not the final principal payment made upon maturation of the note. Bond asserts the assessment of a late fee upon untimely tender of the final payment, including the principal pay-off, was specifically contemplated by the note.

The primary goal of contract interpretation is to determine and give effect to the parties' intentions. *Helterbrand v. Five Star Mobile Home Sales*, *Inc.*, 48 S.W.3d 649, 658 (Mo. App. 2001). "We will determine the intent of the parties based on the contract alone, and only where the contract is ambiguous on its face

14

may we look outside the contract to determine the parties' intent." *J.H. Berra Const. Co. v. City of Wash.*, 510 S.W.3d 871, 874 (Mo. App. 2017). "A contract is ambiguous if its terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." *Trimble v. Pracna*, 167 S.W.3d 706, 714 (Mo. banc 2005).

The 2011 Hillcrest Note provided, in pertinent part:

> The entire unpaid principal balance of this Note shall be due and payable on April 7, 2012 (the "Maturity Date"). This Note is not a revolving credit facility, and Borrower may not borrow, repay and reborrow funds hereunder. **All monthly payments of interest shall be made in arrears and due on the 1st day of each month.** If a payment is 5 or more days late, Borrowers will be charged a late fee of five percent (5.00%) of the regularly scheduled payment.

(Emphasis in original). Bond argues, *inter alia*, that the final sentence of the late fee clause states that a 5% late fee applies to "payments" and "regularly scheduled payments," which must be read to include both "monthly payments of interest" and the principal payment due upon maturation. Robb contends that those terms plainly refer only to monthly interest payments.

Although the note does not define the disputed terms, we can derive contextual meaning from a review of a dictionary. *Bailey v. Federated Mut. Ins. Co.*, 152 S.W.3d 355, 357 (Mo. App. 2004). The definition of "regularly" is: in a regular, orderly, lawful, or methodical way. *Regularly*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1913 (1993). And of the several definitions for the term "regular," the one that most plausibly applies in the context of the note is:

15

"returning, recurring, or received at stated, fixed, or uniform intervals." *Regular*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1913 (1993). Further, the dictionary defines "scheduled" as: "to appoint, assign, or designate to do or receive something at a fixed time in the future." *Schedule*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2028 (1993). And finally, the dictionary defines "payment" as: "something that is paid: the discharge of a debt or obligation." *Payment*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1659 (1993).

Based on these definitions, it is reasonable to conclude that the term "regularly scheduled payment," as used in the 2011 Hillcrest Note, refers to the monies Bond was to receive at fixed, recurring intervals to discharge the debt owed by Robb. While that definition could apply to the contractual term "monthly payments of interest" as referenced in the prior sentence, the term "payment" could also refer to all monies tendered by Robb as the borrower. At best, the late fee clause of the 2011 Hillcrest Note is ambiguous because the terms of the note are susceptible to more than one meaning, in that either Bond's or Robb's construction could reasonably apply. *See Bailey*, 152 S.W.3d at 357. However, as the drafter of the note, Bond cannot benefit from this ambiguity. "Where a contract is fairly open to two or more interpretations, it will be construed against the party who prepared the contract." *Trimble*, 167 S.W.3d at 714. Therefore, Bond's third point is denied.

16

In Point IV, Bond contends that the circuit court erred in finding that the late fee clause was an impermissible penalty rather than liquidated damages. Based on our determination in Point III that the late fee clause was ambiguous and must be construed against Bond, we need not further address this matter. Point IV is denied.

**C. Foreclosure Sale**

In Point V, Bond contends the court erred in determining that the UCC foreclosure sale held to dispose of the stock securing the four notes was not completed in a commercially reasonable manner. Additional facts are discussed herein to provide context for this argument.

CCSB shares are publicly, but lightly, traded without restriction on the over-the-counter bulletin board or pink sheet market ("OTC Market"). Prior to the events at issue in this appeal, Johnson had received regulatory approval to own or beneficially control up to 25% of the ownership of CCSB. Since 2007, Johnson, either personally or through several corporate entities, had actively and continuously solicited CCSB shareholders with offers to purchase their shares or to obtain proxies for voting purposes. Park G.P., Inc. ("Park") was one such entity. During trial, Usera described Johnson as a "dissident shareholder" who had previously sued CCSB and expressed ongoing criticism of the operations of the Bank.

As noted *supra*, Thomson, acting as Bond's attorney, sent a letter notifying Robb of Bond's intention to dispose of the 23,007 shares securing the four notes

17

at a UCC foreclosure sale scheduled for December 15, 2015.  The notice of public sale for all the notes was not separately advertised. The combined advertisement appeared in: (1) the Kansas City Business Journal on December 11, 2015; (2) the Liberty Tribune on December 3, 2015 and December 10, 2015; and (3) in the Excelsior Springs Standard on December 3, 2015, December 11, 2015, and December 15, 2015.  The latter two publications are not customarily known as publishers of notices concerning foreclosure sales of publicly traded stock but rather real estate.  At no time prior to sale of the stock, did Bond provide CCSB or its stockholders notice of the foreclosure sale or offer the shares to either in a private sale.  Further, Thomson never offered Bond or Park the shares, despite Johnson and Bond's earlier offer to purchase the shares at $10.00 per share.

Prior to December 15, Robb commenced the current action, initially asking for a restraining order enjoining the foreclosure sale proposed by Bond. Consequently, the foreclosure sale was continued from December 15 to December 22 before being continued to December 30, 2015.  On that same day, the circuit court denied Robb's request for temporary injunction and the sale was set for January 12, 2016.  The original publication for the foreclosure sale stated that any buyer would be required to both tender the purchase price in cash at the time of sale and certify that he or she was acquiring the share for his or her own investment and not for subsequent resale or as the agent of another.  Bond asserted that the latter obligation was promulgated to comply with the Security Exchange Commission's guidance on sales done without the assistance of a

18

registered broker-dealer.  One day before the January 12 foreclosure sale, Thomson modified the terms of the sale, allowing successful bidders to pay 10% of the bid price at the time of sale and the balance by noon the following day.  This modification was not published, posted, or publicly announced by Bond except on the date of the sale.

The Thistle and Crest shares were sold in two distinct blocks on January 12, 2016.  The Thistle shares sold for $71,000 or $7.10 per share, while the Crest shares fetched $54,000 or $7.03 per share.  Matt Duffield, former husband of Deann Totta, the vice president of Bond's related corporate entity, Maxus Properties, Inc., purchased both blocks of stock.  Although Duffield certified that he was purchasing the shares for his own account, Thomson later testified that DEW, LLC ("DEW"), which had been formed two days after the foreclosure sale, had actually purchased the shares.  Thomson initially refused to disclose the identity of DEW's owner, citing attorney-client privilege, but, after being compelled to answer, identified David E. Watson as the owner.  Watson was Johnson's friend of thirty years and the two co-owned another business at the time of the sale.  Finally, the court heard testimony that Johnson maintained a "Cheat Sheet" to keep track of the shares of CCSB stock that he beneficially owned.  This "Cheat Sheet" was last updated on December 27, 2016, by Totta to reflect that Johnson was the beneficial owner of Watson's 17,765 CCSB shares that DEW had supposedly purchased.

Missouri law provides that "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." § 400.9-610(a). But "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." § 400.9-610(b). If the disposition is commercially reasonable, however, the secured party "may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms." *Id.* "Whether a sale is commercially reasonable is a question of fact." *Ford Motor Credit Co. v. Harris*, 386 S.W.3d 864, 867 (Mo. App. 2012).

Bond asserts that the circuit court erred in determining that the sale of Thistle and Crest's stock was not held in a commercially reasonable manner because the finding was against the weight of the evidence. A claim that the circuit court's "judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." *J.A.R. v. D.G.R*, 426 S.W.3d 624, 630 (Mo. banc 2014). Accordingly, "[t]he against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Ivie*, 439 S.W.3d at 206. Indeed, "[a] circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record

at trial, the existence of a fact that is necessary to sustain the judgment." *Id.* It is for these reasons that Bond's fifth point must fail.

Here, the circuit court found that Bond had engaged in a commercially unreasonable sale that was structured to allow Bond to acquire Robb's shares both at a reduced price and without the danger of outside competition. The evidence of Bond's repeated failure to provide pay-off balances, inflation of pay-off amounts, and the off-market sale of the CCSB shares, supports the court's finding that Bond disposed of Robb's collateral in a commercially unreasonable fashion. Bond, however, posits that we should view the factual determinations of the circuit court in a new light—one in which the pre-sale maneuvering was out of an abundance of caution and a sincere interest in engaging in a commercially reasonable disposition of the collateral at issue. This we cannot do. "When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence." *Id.* Bond's fifth point is denied.

### D. Counterclaims

In Point VI, Bond contends the court erred in denying relief on its five counterclaims because there was sufficient evidence to support the award of a deficiency judgment against Robb for breach of the promissory notes and personal guaranties.

To prevail in a suit on the promissory note, Bond had the burden of demonstrating: (1) the existence of a valid promissory note signed by Robb; (2) the remaining balance due; and (3) a demand for payment and Robb's failure or refusal

21

to pay, thereby leaving Robb in default. *Bank of Houston v. Action Land & Cattle Co.*, 521 S.W.3d 304, 306 (Mo. App. 2017). To recover on an action concerning the contract of guaranty, Bond had to demonstrate: (1) that Robb executed the guaranty, (2) that Robb unconditionally delivered the guaranty; (3) that Bond extended credit in reliance on the guaranty; and (4) that Bond is a currently owed a sum of money that is covered by the terms of the guaranty. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993).

In denying Bond's previous points on appeal, we found no error in the circuit court's determination that Robb did not have a remaining balance owed to Bond under the promissory notes. Consequently, the record supports the court's further determination that Bond is not entitled to a deficiency judgment on any of its five counterclaims. Bond's sixth point is denied.

### E. Denial of Attorneys' Fees and Costs

In Point VII, Bond contends that it was entitled to an award of attorneys' fees and costs as the "prevailing party" in this action.

"If a contract provides for the payment of attorney's fees in the enforcement of a contract provision, the trial court must award them to the prevailing party." *Kansas City Live Block 139 Retail, LLC v. Fran's K.C. Ltd.*, 504 S.W.3d 725, 736 (Mo. App. 2016) (internal citation and quotations omitted). The "prevailing party is the party prevailing on the main issue in dispute, even though not necessarily to the extent of its original contention." *Miller v. Gammon & Sons, Inc.*, 67 S.W.3d 613, 625 (Mo. App. 2001) (internal citation and quotations omitted).

22

Here, both parties agree that the main issues in dispute are: (1) whether the 2011 Hillcrest Note was modified and extended; and (2) whether Bond was entitled to collect the late fees and penalties prescribed in the four promissory notes. Bond did not prevail on these issues below and, based on our disposition of this case, Bond is not the prevailing party on any of its nine points on appeal. Consequently, Bond's seventh point on appeal is denied.

## F. Tortious Interference and Other Affirmative Relief

In Point IX, Bond asserts that the circuit court erred in granting judgment in favor of Robb on his claim that Bond tortiously interfered with a business expectancy. Bond contends there was no evidence that it had knowledge of the business expectancy – i.e. Robb's impending sale of the CCSB stock – with which Bond allegedly interfered.

"To prove a claim for tortious interference with a contract or business expectancy, the plaintiff must demonstrate: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct." *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 19 (Mo. banc 2012). To be entitled to relief under this cause of action, Robb, in regards to the element of Bond's knowledge, had to demonstrate that Bond either "had actual knowledge of the existence of the [business expectancy] and of [Robb's] interest in it, or [that Bond] had knowledge of such facts and circumstances that would lead a

23

reasonable person to believe in the existence of the [business expectancy] and Robb's interest in it." *Howard v. Youngman*, 81 S.W.3d 101, 113 (Mo. App. 2002) (internal citation and quotations omitted).

Bond contends the evidence at trial only demonstrated that Bond was aware that Robb had thought about selling its CCSB shares. However, the record reflects additional evidence indicating that Bond had knowledge of Robb's discussions concerning the sale of the CCSB stock or any related loan with CCSB. At trial, Bond itself entered several exhibits containing email communications between Robb, Johnson, Alvey, and Thomson. One such email, sent from Johnson to Robb on August 5, 2015, stated: "[R]andy[,] you paid 1000 of interest but owe [$]17,200 of interest on other 3 notes[.] When can we get this paid[?] [A]lvey says you have offers to buy your stock? [W]hat is pricing[?] [W]e can look at releasing the shares if it gets us paid off[.]" Robb responded six days later asking if Johnson had a few minutes to speak over the course of the next few days. Johnson stated that he would like to have update first and requested that Robb provide him with a date by which Robb would repay the interest that was past due on the notes.

Bond argues that this email exchange merely communicated a potential sale and that Bond still had no knowledge of any "detail regarding the identity of the buyer, the sale price or the expected sale closing date." Knowledge of these details, however, is not necessary to support a claim of tortious interference with a business expectancy. "It is enough to show that defendant had knowledge of

24

facts, which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties." *Id.* (internal citation and quotations omitted).

In *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, 315-16 (Mo. banc 1979), the court ruled that plaintiffs properly pled the knowledge element of tortious interference by alleging that the defendants had "entered into illegal 'tying' agreements, under which [school] districts could obtain group accident and health insurance only if they purchased group life insurance, and other anticompetitive agreements that caused school districts to refuse to deal with [plaintiffs and other competitors.]" Although the allegations did not state that the defendants specifically knew about the particular expectancy of each competitor, the court found the pleading sufficient to show "that [defendants] knew their activities tortiously interfered with the business relations of [their] potential competitors, and that [the plaintiffs] were potential competitors." *Id.* at 316. We find the circumstances of *Fischer* sufficiently analogous to the factual findings before us.

Here, the record indicates that Bond had knowledge of a potential buyer for the CCSB shares prior to moving forward with the foreclosure. The circuit court determined that Robb was prevented from closing the stock sale and subsequent loan with CCSB because Bond had ignored Robb's repeated requests for pay-off balances on the four notes. The court determined that Bond had engaged in this disregard because it had learned of a potential buyer for Robb's shares, which Bond

25

wanted to secure for itself.  Further, the circuit court determined that once Bond actually did provide the requested information, it provided intentionally inflated pay-off balances on each of the four notes in order to prevent Robb from closing with another buyer.  Finally, the court found that Bond conducted a commercially unreasonable foreclosure sale of Robb's CCSB shares to allow Johnson to acquire beneficial control of the CCSB shares at a fraction of the market price.

As in *Fischer*, the circuit court found that Bond had engaged in the anti-competitive, spurious accounting to prevent other competitors from having an opportunity to buy the stock. *See id.*  Bond had knowledge that a potential buyer existed and could have, with reasonable inquiry, determined the terms of the business expectancy. *See Howard*, 81 S.W.3d at 113.  Consequently, Bond's ninth point is denied.

In Point VIII, Bond argues the court erred in granting judgment in favor of Robb on Robb's affirmative claims for relief.  Bond contends that the collective errors asserted in the preceding points require us to reverse the judgment of the circuit court.  Bond offers no further argument and relies solely on points that we have denied herein. Accordingly, Bond's eighth point is also denied.

**II. Robb's Appeal**

Robb's two points on appeal concern the circuit court's calculation of offsets and damages.  In his first point, Robb contends he should be awarded the difference between the $10.00 share price that the court determined would have been realized if the shares were disposed in a commercially reasonable manner and

26

the $7.03 and $7.10 per share price Crest and Thistle, respectively, received credit for after the foreclosure sale. We note that the circuit court's judgment includes a determination that Robb "is entitled to damages or offsets for the $3.00 difference."[6] However, the court failed to include the offset in the damage calculations. We therefore reverse the circuit court's award of damages and remand the issue back for a calculation of damages in light of its previous determination that Robb is entitled to the award of an offset.

In Point II, Robb contends the circuit court should have limited his liability pursuant to Section 400.9-626, which, *inter alia*, limits debtor liability after a secured party fails to dispose of collateral attached by a security interest in a commercially reasonable manner. In light of our reversal of the damages award, we need not decide whether the court was obligated to apply this limitation. On remand, however, the circuit court should consider the award of offset interest as a mechanism to which Robb may be restored to the position he would have occupied without Bond's wrongful action. In so doing, the court can, *but is not required to*, award such offset interest. Section 400.9-625(b). We caution, as Bond has suggested, that Robb not be given a second chance to prove damages it did not sufficiently demonstrate in the original action. Additionally, in making its determination after our remand, the circuit court should consider the operation of

---

[6] On page thirty-five of the judgment, the circuit court stated: "The Court has determined that [Robb] is entitled to damages or offsets for the $3.00 difference in the $7.00 per share price purportedly realized by the commercially unreasonable foreclosure sale and the minimum $10.00 per share price that would have been realized by a commercially reasonable sale or upon the refinancing of the legitimate debt by CCSB Financial Corp[.]"

27

Section 400.9-626 on the award of any damage amount. Point II is therefore granted, to the extent that the issues raised therein may be addressed on remand.

## CONCLUSION

The judgment of the circuit court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

_____
**LISA WHITE HARDWICK, JUDGE**

ALL CONCUR.

28